James J. NICHOLSON

v.

CPC INTERNATIONAL INC., a corporation, and James R. Eiszner, Appellants.

No. 88–5588.

United States Court of Appeals, Third Circuit.

Argued Dec. 8, 1988.

Decided June 2, 1989.

As Amended June 7, 1989.

Rehearing and Rehearing In Banc Denied July 10, 1989.

Carmine A. Iannaccone (Argued), John M. Simon, Hannoch Weisman, P.C., Roseland, N.J., Samuel Estreicher, Cahill Gordon & Reindel on the brief, New York City, for appellants.

Walter L. Leib, Gary E. Roth (Argued), Richard M. Cohen, Leib, Kraus, Grispin & Roth, P.C., Scotch Plains, N.J., for appellee.

Charles A. Shanor, Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Lorraine C. Davis, Asst. Gen. Counsel, Gale Barron Black (Argued), E.E.O.C., Washington, D.C., for amicus curiae in support of appellee.

Before SLOVITER and BECKER, Circuit Judges, and FULLAM, District Judge *.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The district court certified for interlocutory appeal under 28 U.S.C. § 1292(b) (1982) its order denying the defendants' motion to compel arbitration of the claim of plaintiff, a former employee, alleging that his termination violated the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq. (1982 & Supp.1986). This court is presented for the first time with the question whether an ADEA suit may be maintained despite a provision in an employment contract to arbitrate disputes arising out of the employment. We conclude, after applying the test of arbitrability devised by the Supreme Court in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), and *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), that Congress did not intend that the right under the ADEA to a judicial forum for protection against age discrimination would be subject to displacement.

## I.

The plaintiff in this case, James J. Nicholson, was hired by defendant CPC International, Inc. (CPC) as an attorney in 1957. He rose steadily through the corporate ranks and was appointed Vice–President for Corporate Financial Services in 1981. In January 1986, apparently in anticipation of a possible takeover move, Nicholson and the approximately thirty other corporate officers of CPC in domestic locations were presented with an executive employment agreement, which Nicholson signed. The agreement defined, inter alia, compensation, benefits, job title, and termination pro-

---

* Hon. John P. Fullam, Chief Judge, United States District Court for the Eastern District of Penn-

cedures and benefits,[1] and contained an arbitration clause providing that:

> Any dispute or controversy arising under or in connection with this Agreement shall be settled exclusively by arbitration, conducted before a panel of three arbitrators in New York City in accordance with the rules of the American Arbitration Association then in effect. Judgment may be entered on the arbitrators' award in any court having jurisdiction. The expense of such arbitration shall be borne by the Company.

App. at 107.·

Approximately one year after signing this agreement, Nicholson was informed that his position was to be eliminated in a corporate restructuring. Nicholson filed a timely age discrimination charge with the EEOC which was administratively terminated at his request so that he could file suit. He sued CPC and its President in New Jersey Superior Court, raising claims under the ADEA, state antidiscrimination law, and common law breach of contract theories. CPC removed the case to federal court and moved for an order compelling arbitration of all of Nicholson's claims pursuant to the clause in the employment agreement.

On April 18, 1988, the district court, per Judge H. Lee Sarokin, denied CPC's motion for an order to compel arbitration of the ADEA claim, but granted the motion with respect to all claims arising under state law.[2] Judge Sarokin had previously held in *Steck v. Smith Barney, Harris Upham & Co.*, 661 F.Supp. 543 (D.N.J.1987), that the text and legislative history of the ADEA demonstrated that Congress intended that ADEA claims be nonarbitrable. In denying CPC's motion for arbitration, Judge Sarokin stated that the Supreme Court's opinion in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct.

2332, 96 L.Ed.2d 185 (1987), did not alter the analysis he had used in *Steck*.

Following the district court's ruling, CPC requested the court to certify for interlocutory appeal under 28 U.S.C. § 1292(b) the question "whether the plaintiff's federal claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* is arbitrable." App. at 57. The district court, undoubtedly cognizant that under the statute it can certify only an order, not a question, *see Johnson v. Alldredge*, 488 F.2d 820, 822–23 (3d Cir.1973), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974), certified the portion of the order dealing with the ADEA claim because it was of the opinion "that the arbitrability of an action under the ADEA is a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." App. at 62. This court granted CPC's petition for leave to appeal on July 6, 1988. We subsequently granted a motion by the Equal Employment Opportunity Commission (EEOC) to intervene in support of Nicholson's position.

## II.

In several recent cases, the Supreme Court discarded its earlier reluctance to order arbitration of statutory claims. In *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), the Court stated that the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* (1982), establishes a " 'federal policy favoring arbitration,' " *id.* 107 S.Ct. at 2337 (quoting *Moses H. Cone Memorial Hosp. v. Mercury/Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)), which is not diminished when a

---

sylvania, sitting by designation.

1. Nicholson's brief raises a number of factual issues, and disputes CPC's claim that the agreement increased his severance benefits and that his assent was voluntary. The district court did not decide these issues, and, because our disposition is based on a legal issue, we do not reach them.

2. The district court found that the scope of the arbitration clause in Nicholson's employment contract encompassed his age discrimination claim. In view of our holding, we do not reach Nicholson's contention that the language of the arbitration clause is inapplicable to his ADEA claim.

party to an arbitration agreement raises claims under a federal statute. However, the presumption of arbitrability under the FAA will be defeated when it is "overridden by a contrary congressional command" in another statute. *Id.* Applying these principles, the Court has held arbitration agreements to be enforceable with respect to claims arising under the Sherman Act, *see Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982), *see Shearson,* 107 S.Ct. at 2338–43, and under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* (1982), *see Shearson,* 107 S.Ct. at 2343–46. Moreover, the Court has just overruled its decision in *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), which had held arbitration agreements were not enforceable as to claims under section 12(2) of the Securities Act of 1933. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* — U.S. ——, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). The *de Quijas* opinion is consistent with the line of cases enforcing arbitration agreements in the setting of business transactions.

Significantly, the Court in *Mitsubishi* noted "[t]hat is not to say that all controversies implicating statutory rights are suitable for arbitration." 473 U.S. at 627, 105 S.Ct. at 3354; *see also Gavalik v. Continental Can Co.,* 812 F.2d 834, 850 (3d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987) (Congress did not intend that plaintiff raising discrimination claim under ERISA be required to exhaust arbitral remedies). Nothing in *Mitsubishi* or *Shearson* suggests that the Court was overruling its prior holdings that arbitration agreements do not preclude access to a judicial forum for resolution of claims arising under the Fair Labor Standards Act (FLSA), *see Barrentine v.*

*Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); under 42 U.S.C. § 1983, *see McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); and under Title VII of the Civil Rights Act of 1964, *see Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Although each statutory scheme requires its own discrete analysis, in deciding whether the statutory right under the ADEA to a judicial forum can be waived we are guided by the Court's decisions, on one hand, that access to the courts under the FLSA, section 1983 and Title VII cannot be displaced and by its decisions, on the other hand, that the right to a court trial is waivable under the Sherman Act, securities acts and civil RICO.

We proceed to examine the statutory scheme embodied in the ADEA to ascertain whether Congress intended "to preclude a waiver of judicial remedies for the statutory rights at issue," a determination which must be made " 'from the text or legislative history' " of the statute or from "an inherent conflict between arbitration and the statute's underlying purposes." *Shearson,* 107 S.Ct. at 2337 (citing *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354).

### A. *The Text of the ADEA*

No language in the ADEA speaks directly to the effect of an arbitration agreement.[3] On the other hand, the statutory scheme reflects Congress' careful structuring of the procedure to be followed in enforcing the rights granted by the Act.

The ADEA vests primary enforcement responsibility with the Equal Employment Opportunity Commission (EEOC), 29 U.S.C. § 626, to which the individual's right of action under the Act is secondary. Thus, individuals are not permitted to file suit alleging unlawful discrimination under the ADEA unless they first file an administra-

---

**3.** We assume that when the Court directed us to examine the statutory text, we were not to limit our search to explicit language prohibiting waiver of a judicial forum. If the absence of such language were dispositive, there would have been no need for the Court to have listed other factors to be examined in discerning congressional intent. Instead, we understand the Court to have instructed us to examine the entire statutory scheme as indicative of Congress' intent as to the manner in which it should be enforced.

tive complaint with the EEOC and wait sixty days while the EEOC considers the charge. 29 U.S.C. § 626(d). The EEOC is instructed under the Act to "attempt to eliminate the discriminatory practice or practices alleged" by first attempting to effect voluntary compliance with the statute "through informal methods of conciliation, conference, and persuasion." 29 U.S.C. § 626(b). If these methods of inducing compliance fail, the EEOC is authorized to bring suit in a court of competent jurisdiction. 29 U.S.C. § 626(c)(1). Once the EEOC has exercised this option, the individual's right to file suit terminates. *Id.* In this respect, unlike under Title VII, *see* 42 U.S.C. § 2000e–5(f)(1), the individual's right under the ADEA to seek redress against an employer for age discrimination is subordinate to the enforcement activities of the public agency charged with the Act's administration. *See also Rogers v. Exxon Research and Engineering Co.*, 550 F.2d 834, 841 (3d Cir.1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978).

Although enforcement of the ADEA has shifted from the Secretary of Labor to the EEOC, *see* Reorg. Plan No. 1 of 1978, 43 Fed.Reg. 19,807, *reprinted in* 5 U.S.C. App. at 1155 (1982), *and in* 92 Stat. 3781, the original requirement that the ADEA be enforced pursuant to the enforcement provisions of the FLSA has been fully retained and continues to govern enforcement proceedings under the Act. Our consideration of the effect of the statutory scheme on the arbitrability of ADEA claims is, therefore, informed by the decision of the Supreme Court in *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), holding that the provisions of the FLSA set forth in 29 U.S.C. § 216(b) were intended to give employees a right of access to court which could not be waived through an agreement to arbitrate. These provisions, including civil liability for employer violations of the applicable laws, a right by aggrieved employees to bring an action in any court of competent jurisdiction, and the termination of this right upon the filing of a complaint for "injunction proceedings" by the agency

in charge of enforcement of the statute, *see* 29 U.S.C. § 216(b), are as fully applicable to ADEA actions as to FLSA actions. The *Barrentine* Court held that notwithstanding the national policy in favor of contractual dispute-resolution procedures between labor and management, "[n]ot all disputes between an employee and his employer are suited for binding resolution in accordance with the procedures established by collective bargaining" and stated that "different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers." 450 U.S. at 737, 101 S.Ct. at 1443.

CPC argues that *Barrentine* is distinguishable in spite of its consideration of the identical remedy provisions as those involved here because claims arising under the ADEA are different in nature from those under the FLSA and because an individual rather than a collective arbitration agreement is involved. We agree that further inquiry into the arbitrability of ADEA claims is warranted, although we must give due regard to the authority provided by *Barrentine.*

B. *The Legislative History of the ADEA*

The Court has instructed us to turn to the legislative history as well as the textual provisions of the statute at issue to discern whether there is evidence of Congress' intent to establish an enforcement scheme that would not be preempted by arbitration. As in the case of the statutory language, we find no direct reference to arbitration and we must therefore draw inferences from Congress' actions.

A precursor proposal to the ADEA would have added discrimination on the basis of age to the forms of discrimination prohibited by Title VII. After the defeat of this proposal, *see* 110 Cong.Rec. 2599, 13,492 (1964), *reprinted in* EEOC, *Legislative History of the Age Discrimination in Employment Act* 8, 14 (1981) [hereinafter *ADEA History* ], the final version of Title VII enacted into law merely directed the Secretary of Labor to investigate the ex-

tent of age discrimination in employment and to make recommendations about appropriate legislative responses. *See* The Civil Rights Act of 1964, Pub.L. No. 88–352, Title VII, § 715, 78 Stat. 265–66 (1964). Following the issuance of the Secretary of Labor's report, which documented a pervasive problem of age discrimination throughout the economy, *see* Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment (1965), *reprinted in ADEA History* at 16–41 [hereinafter "Secretary's Report"], Congress again took up consideration of legislation to bar discrimination on the basis of age in employment. At this time, the debate about enforcement narrowed to the choice between patterning an enforcement scheme on that of the National Labor Relations Act (NLRA) or on the FLSA.

Despite an unsuccessful attempt in 1966 to have the proposed statute prohibiting age discrimination enforceable under the FLSA through the Wage and Hour Division of the Department of Labor, Senator Javits again introduced this proposal in 1967. *See* 113 Cong.Rec. 2199 (1967), *reprinted in ADEA History* at 64. Senator Yarborough introduced a competing proposal, supported by the Administration, which contained an enforcement scheme modelled after that of the NLRA, and thus would have provided for resolution of claims of age discrimination through administrative proceedings, with hearings conducted by the Department of Labor and review of the Secretary's determinations through petition to the courts of appeals. *See* 113 Cong.Rec. 2795 (1967), *reprinted in ADEA History* at 69.

The applicable House and Senate committees considered these alternative proposals and opted for the FLSA enforcement scheme proposed by Senator Javits. *See* H.R.Rep. No. 805, 90th Cong., 1st Sess. 5–6 (1967), *reprinted in ADEA History* at 78–79, U.S.Code Cong. & Admin.News 1967, p. 2213; Sen.Rep. No. 723, 90th Cong., 1st

Sess. 5, 13–14 (1967), *reprinted in ADEA History* at 109, 117–18. The bills adopting the FLSA scheme which were reported out of these committees became the basis for the ADEA, passed by both houses and signed into law later that year. Thus, Congress made a deliberate policy choice in favor of enforcement of ADEA claims in court proceedings.

Significantly, Congress did not borrow the enforcement scheme of Title VII, which at that time granted aggrieved individuals, but not the EEOC, authority to bring suit against private employers. *See* The Civil Rights Act of 1964, Title VII, § 706, Pub.L. No. 88–352, 78 Stat. 259–62 (1964).[4] Instead, Congress placed primary responsibility for eliminating age discrimination in employment in the hands of the Secretary of Labor (later the EEOC) and gave the Secretary the power to ensure compliance with the ADEA by filing suit, if necessary, on behalf of the aggrieved individual.

In 1978, Congress amended the ADEA to reinforce further the statute's focus on public agency enforcement through the courts, adding a provision to toll the statute of limitations for filing suit for up to one year pending completion of agency efforts to effect voluntary compliance. *See* 29 U.S.C. § 626(e)(2). The purpose of this amendment, according to the Senate committee recommending it, was to ensure that "[t]he claim of discrimination ... be decided on the merits *through litigation* in the event the conciliation process fails" and "to prevent those who have violated the Act from delaying and postponing conciliation and thereby possibly avoiding liability." Sen.Rep. No. 493, 95th Cong., 1st Sess. 13 (1977), *reprinted in ADEA History* at 446 (emphasis added). This suggests that Congress intended that extrajudicial methods of seeking resolution of age discrimination claims should not impede ultimate resolution of those claims in a judicial forum when extrajudicial methods proved inadequate.[5]

---

**4.** This section was amended in 1972 to grant the EEOC broader litigation powers. *See* Equal Employment Opportunity Act of 1972, Pub.L. No. 92–261, § 4, 86 Stat. 104 (1972).

**5.** Both Nicholson and the EEOC as amicus curiae on behalf of Nicholson argue that Senator Kennedy's 1978 amendment to the ADEA making explicit the right to a jury trial, *see* 29 U.S.C.

## C. *Inherent Incompatibility*

■ Because the language of the statute and the legislative history, while suggestive, are not conclusive of congressional intent regarding arbitration of ADEA claims, we must examine whether the objectives of the ADEA are inherently incompatible with the displacement by arbitration of a judicial forum for claimants alleging age discrimination. *See Shearson,* 107 S.Ct. at 2337. Our examination of this factor leads us to conclude that the ADEA is one of the statutory schemes that present the "inherent conflict [with] arbitration" referred to by the Supreme Court in *Shearson. Id.*

We begin with Congress' clear intent that compliance with the ADEA be overseen by a public agency. The EEOC's obligation to enforce the ADEA goes beyond its authority to investigate and redress a particular employee's complaint. Acting under its statutory powers set forth in, *e.g.,* 29 U.S.C. §§ 209, 211, 216, 217, 625, 626, the EEOC has promulgated regulations pursuant to which it investigates violations of the ADEA and takes measures to secure enforcement. It may receive information concerning alleged violations of the ADEA "from any source." 29 C.F.R. § 1626.4 (1988). It may investigate and gather data, inspect establishments and records, interview employees, and impose recordkeeping and reporting requirements. 29 C.F.R. § 1626.15. It is also the agency that must issue interpretative regulations which provide guidance to all employers. 29 U.S.C. § 628. It advises employers, employment agencies and labor organizations of their obligations under the Act and any necessary changes in their policies as employers. 29 C.F.R. § 1626.15.

As the agency entrusted by Congress with oversight of the age discrimination law, the EEOC has the obligation to report to Congress annually and to submit its recommendations for further legislation. 29 U.S.C. § 632. Although some of its information may come from investigations which it has independently initiated, *see* 29 C.F.R. § 1626.4, obviously much of its information will be triggered by investigations based on charges filed in particular cases. Any procedure that detracts from the EEOC charge requirement would undermine Congress' design, since the charge not only informs the EEOC of the particular discrimination but also may identify other unlawful practices.

In cases dealing with Title VII, the Supreme Court has noted the importance of the charge requirement. *See EEOC v. Shell Oil Co.,* 466 U.S. 54, 69, 104 S.Ct. 1621, 1631, 80 L.Ed.2d 41 (1984) (a charge places the EEOC on notice that someone believes a violation has been committed and helps to focus the EEOC investigation); *General Telephone Co. v. EEOC,* 446 U.S. 318, 326, 100 S.Ct. 1698, 1704, 64 L.Ed.2d 319 (1980) ("the EEOC is not merely a proxy for the victims of discrimination … it acts also to vindicate the public interest in preventing employment discrimination."). The charge serves equally important roles under the ADEA.

Because the filing of a charge is a prerequisite to a court action under the ADEA, *see* 29 U.S.C. § 626(d), the statutory scheme insures that the EEOC will receive information about employment practices in the marketplace through the series of charges filed with it. Employees and lawyers for employees will have little incentive to file charges of age discrimination with the EEOC if they cannot thereafter proceed to a judicial forum but instead must arbitrate their claims, a procedure which does not require filing of an EEOC charge. Of course, aggrieved parties *can* go to the EEOC in any event, as the dissent argues, but they are not likely to do so. The EEOC *can* continue to investigate, but it will be deprived of the charge as a triggering mechanism. Any process which contributes to employers' avoidance of the scrutiny to which an EEOC charge investigation would subject them is neces-

§ 626(c), demonstrates Congress' intent that access to a judicial forum be nonwaivable under the ADEA. In light of the fact that a right to a jury trial also exists for claims brought under

the Sherman Act, which the Court found to be arbitrable in *Mitsubishi,* we do not rely on this aspect of the ADEA's legislative history.

sarily incompatible with the congressional scheme for the ADEA.

The EEOC's role in conciliation and mediation after filing of the charge is another significant indicator of Congress' intent as to the procedure it preferred to be followed for age discrimination claims. CPC argues that because the ADEA encourages resolution of age discrimination disputes through "informal methods of conciliation, conference, and persuasion," 29 U.S.C. § 626(b), arbitration, another informal method for resolving disputes, is consistent rather than incompatible with the statutory scheme. CPC's argument misses the point. Congress' intent, as explicitly stated in the text of the statute, is not only that disputes concerning claims of age discrimination be resolved through informal means, but that *the EEOC "eliminate* the discriminatory practice or practices alleged" by encouraging voluntary compliance if possible. *Id.* (emphasis added). It is only through the conciliation process that the EEOC has its opportunity to secure voluntary compliance.

Moreover, no statutory provision gives the EEOC the power to affect the arbitration procedure. In this respect, it is unlike the Securities Exchange Commission, which the Supreme Court noted in *Shearson* has been given "expansive power to ensure the adequacy of the arbitration procedures employed" by the self-regulatory organizations [SROs], such as the national securities exchanges and the registered securities associations. *See* 107 S.Ct. at 2341.[6]

■ Another principal indicator of the incompatibility of the ADEA with arbitration stems from the inadequacy of arbitration in many cases to enforce the statute effectively. We will assume, as CPC argues, that an arbitrator may award reinstatement of an employee terminated because of age discrimination. Nonetheless, arbitral boards do not have the power to award broad equitable relief which courts have under 29 U.S.C. §§ 626(b). For example, courts, but not arbitrators, possess power to issue injunctive relief to bar employers from future acts of discrimination. The power of arbitrators does not extend beyond the particular grievants and the particular dispute before them, and arbitrators cannot prohibit an employer from applying discriminatory practices to other employees. *See American Arbitration Association, Commercial Arbitration Rules* 17 (1981), *reproduced in* App. at 127 (AAA rules provide that arbitrators' remedies confined to "the scope of the agreement of the parties.").[7]

Congress' intent that courts hearing an ADEA action be invested with power to

---

6. The Court in *Shearson* stated that *"since the 1975 amendments* to section 19 of the Exchange Act" the SEC has been given broad authority to regulate the rules these organizations use for arbitrations, including the power to require the adoption, modification, or deletion of rules to ensure that the arbitration procedures adequately protect statutory rights. 107 S.Ct. at 2341 (emphasis added); *see* 15 U.S.C. § 78s(c) (1982). The ADEA does not expressly empower the EEOC with any authority to dictate to arbitration associations the rules by which they must consider age discrimination claims, much less the power to penalize them for noncompliance. *Cf.* 15 U.S.C. § 78s(h) (listing sanctions available to SEC). The Court's express reliance on an explicit statutory provision contrasts with the dissent's position that we may "infer" delegation of such power to the EEOC. *See* dissenting opinion at 239. The dissent's expansive view of the EEOC's power under the ADEA is different from that held by the EEOC, which in this case contrasts the power of the two agencies, saying "*Unlike the EEOC,* the SEC has the authority to suspend or revoke a [SRO's] registration, to censure and to appoint a trustee on its own initiative." EEOC Amicus Brief at 16 n. 11 (emphasis added).

7. There is no basis on this record to assume that anything governs here other than the AAA Commercial Arbitration Rules in effect at the time of the arbitration, which CPC provided the court in its appendix and referred to repeatedly in its argument. While the dissent refers to a 1978 article with proposed rules for arbitration of employment dispute claims, *see* dissenting opinion at 234 n. 4, no party has referred to them or suggested that they were in effect and applicable here. As to the dissent's argument of expansive arbitral powers, even the secondary source relied on by the dissent would expand an arbitrator's power over parties not before him or her only in limited situations, *i.e.,* those involving a union's action on behalf of represented employees relating to a grievance under the collective bargaining agreement. *See* M. Hill & A. Sinicropi, *Remedies in Arbitration* 240–41 (1981).

resolve the problem of age discrimination effectively is reflected in the statutory provision authorizing maintenance of a collective action, *i.e.*, a suit "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b) (1982). We have recently held that to effectuate this provision, courts may authorize notice to be sent to putative class members. *See Sperling v. Hoffman–La Roche Inc.*, 862 F.2d 439 (3d Cir.1988), *cert. granted*, —— U.S. ——, 109 S.Ct. 1526, 103 L.Ed.2d 832 (1989). In short, Congress intended the EEOC and the courts to "eliminate" discriminatory practices from the workplace, a role that arbitration cannot accomplish as effectively.

We do not base our conclusion on any disparagement of the competence or sophistication of modern arbitrators.[8] The keystone in determining incompatibility between arbitration and a judicial remedy is the intent of Congress with respect to the particular statute. The holdings of the Court's prior opinions in *Gardner–Denver* and *Barrentine* were based on the Court's examination of the provisions, objectives, and enforcement schemes of the statutes involved, and thus we do not deem it dispositive that those portions of those opinions that reflect the now rejected mistrust of arbitration, *see Gardner–Denver*, 415 U.S. at 56–59, 94 S.Ct. at 1023–25, and *Barrentine*, 450 U.S. at 743–45, 101 S.Ct. at 1146–47, may not survive the Court's more recent enthusiastic pronouncements on the virtues of commercial arbitration in *Mitsubishi* and *Shearson*.

CPC seeks to distinguish *Gardner–Denver*, *Barrentine* and *McDonald* because in those cases arbitration was required by a collective bargaining agreement. CPC argues that in *Gardner–Denver*, the Court was unwilling to leave employees' protec-

tion of the right against race discrimination to labor unions who had their own history of such discrimination. *See also Barrentine*, 450 U.S. at 742, 101 S.Ct. at 1445 (Court noted that labor unions do not always pursue goals compatible with those of individual union members). However, it does not follow, as CPC argues, that the arbitration requirement in individually negotiated employment contracts is therefore comparable to that contained in a contract entered into in a commercial context. The disparity in bargaining power between an employer and an individual employee is well known. Older employees who have invested many years of their career with a particular employer may lack any realistic option to refuse to sign a standard form arbitration agreement presented to them by their employers. New employees who need the job may be in a similar position. Although this may not constitute the type of duress which renders a contract voidable, we cannot close our eyes to the realities of the workplace.

■ Nor are we persuaded by CPC's argument that "the majority of ADEA claimants, like Mr. Nicholson, are upper-middleclass, professional/managerial employees," Brief of Defendants–Appellants at 40, who do not need to be protected from the consequences of their well-informed, voluntary decisions to agree to employment contracts containing arbitration clauses. While it is unlikely that Nicholson, an attorney and sophisticated and experienced executive, was unaware of the nature of the agreement he entered into with CPC, we would be ill-advised to fashion a general rule of law on the basis of the characteristics of a particular plaintiff.[9]

Where Congress intended that certain executive-level employees should not be subject to the requirements of the ADEA, it

---

8. We previously noted that most of the reasons given in *Wilko v. Swan*, 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), for deprecating the arbitration remedy have subsequently been rejected, *see Osterneck v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 841 F.2d 508, 511 (3d Cir.1988), and as noted in the text, the Court has overruled *Wilko v. Swan. See Rodriguez de*

*Quijas v. Shearson/American Express, Inc.*, —— U.S. ——, 109 S.Ct. 1917, 104 L.Ed.2d 526.

9. CPC suggests that distinct groups of management employees may prefer arbitration to litigation. *See* Brief of Defendants–Appellants at 25. Nothing in this opinion precludes an employee from voluntarily arbitrating his or her age discrimination claim.

created an explicit statutory exemption. *See* 29 U.S.C. § 631(c). Unlike Nicholson, many ADEA plaintiffs are not highly paid executives. The congressional proponents of the ADEA and the Secretary of Labor's seminal report repeatedly emphasized that age discrimination pervaded the economy and constituted a serious problem for older employees earning higher salaries and benefits, both because employers can reap the greatest financial benefits from replacing these employees with younger, lower paid ones, and because these employees will have difficulty finding a comparable position if discharged. *See* Secretary's Report at 5–6, 15, *reprinted in ADEA History* at 22–23, 32; 112 Cong.Rec. 20,825 (1966), *reprinted in ADEA History* at 56; 113 Cong.Rec. 34,749, 34,752 (1969), *reprinted in ADEA History* at 160, 163. In fact, older employees in highly paid positions may be in a particularly vulnerable position in that employers will have a greater incentive to seek to replace them with younger employees earning lower salaries.

Our analysis of the factors which *Mitsubishi* and *Shearson* instruct us to consider, particularly the inherent incompatibility of the statute with arbitral enforcement and remedies, leads us to conclude that Congress did not intend that a contractual arbitration provision should preclude a claimant from access to a judicial forum. In so holding, we join several of our sister circuits which have reached similar conclusions with respect to the ADEA. *See, e.g., Criswell v. Western Airlines, Inc.,* 709 F.2d 544, 547–49 (9th Cir.1983), *aff'd on other grounds,* 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985); *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1553 (10th Cir.1988); *cf. Swenson v. Management Recruiters International, Inc.,* 858 F.2d 1304, 1305–07 (8th Cir.1988)

---

**10.** The EEOC recognized this difference in its now-suspended policy approving knowing and voluntary retroactive releases of claims while disapproving such releases with respect to prospective rights. *See* 29 C.F.R. § 1627.16(c)(1), *suspended by* Appropriations Act of 1989, Pub.L. No. 100–459, Title V, 102 Stat. 2216 (1988).

(Title VII claims not subject to arbitration under individual employment contract).

The issue before us, an employee's prospective waiver of a judicial forum for ADEA claims, is not comparable to the enforceability of an individual's release of a potential ADEA claim for alleged acts of discrimination that already transpired. *See, e.g., Coventry v. United States Steel Corp.,* 856 F.2d 514 (3d Cir.1988); *EEOC v. Cosmair, Inc.,* 821 F.2d 1085, 1091 (5th Cir.1987); *Runyan v. National Cash Register Corp.,* 787 F.2d 1039, 1045 (6th Cir.) (in banc), *cert. denied,* 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986).[10] The prospective waiver at issue here involves relinquishment of the employee's rights with respect to potential future disputes, which the employee may not have fully anticipated. Therefore, the cases approving retroactive waivers of ADEA claims are not persuasive on the issue of whether prospective waiver is permissible. The EEOC's proposed rule, *see* note 10 *supra,* would have allowed releases of claims without the Commission's supervision or approval, provided that such releases *"do not provide for the release of prospective rights* or claims." 29 C.F.R. § 1627.16(c)(1) (1988). Thus, it appears that the EEOC's proposed rule would have prohibited the prospective waiver which the dissent seeks to enforce in this case.[11]

In conclusion, our examination of the text, legislative history, and objectives of the ADEA have led us to conclude that the right to a judicial forum under the ADEA is not subject to displacement by a prospective agreement to arbitrate disputes contained in individual employment contracts.

We find the dissent, albeit lengthy, unpersuasive and in response merely reiterate the following:

---

**11.** We note that the digression in the dissent on the standard which should govern procedural waivers justified "in the interest of complete expression of [the] dissenting views," dissenting opinion at 241, has nothing to do with the issue before us. Such an excursion will, at most, interest the law review commentators, but we fail to see that it serves any other purpose in the present case.

1. No Supreme Court case requires us to close the doors of the federal courts in an ADEA action merely because the employer has included an arbitration clause in an employment contract. The dissent relies on cases arising in a business context. The closest analogous Supreme Court cases dealing with employees' statutory rights point in the other direction.

2. All of the other court of appeals cases to consider whether an agreement to arbitrate precludes the employee from a judicial forum for resolution of ADEA claims reach the same result as the majority does here.

3. The dissent overlooks the fact that the EEOC, the agency entrusted with oversight of the ADEA, has filed an amicus curiae brief which strongly supports Nicholson's position and requests this court to hold "that arbitration cannot displace judicial enforcement as the exclusive means for resolving claims under the ADEA." EEOC Amicus Brief at 17.

4. If this court holds Nicholson's arbitration agreement effectively precludes him from bringing his ADEA claim in a judicial forum, we may assume that many employers will prepare similar employment contracts, thereby shifting enforcement of the ADEA away from the courts to arbitration. If this is a result desired by Congress, we should wait for Congress to explicitly so state.

### III.

█ Nicholson requests that we extend our review to that portion of the district court's interlocutory order holding that Nicholson's state law claims were arbitrable, even though this portion of the order was not certified for review by the district court. Nicholson argues that it is nonetheless properly before us because we stated in *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 962 n. 7 (3d Cir.1983), *cert. denied*, 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984), that on a section 1292(b) appeal, "we consider all grounds

which might require a reversal of the order appealed from."

We recently rejected a similar argument. *See Sperling v. Hoffman–La Roche Inc.*, 862 F.2d at 443–44. We held there that because the issues involved in the certified and noncertified portions of the order were not closely related, concurrent review was not appropriate. *Id.* at 443–44. In this case as well, the analysis required to consider the arbitrability of the state law claims presented by Nicholson is different from that for his claim arising under the ADEA.

Furthermore, Congress recently enacted a statute which provides that the courts of appeals have jurisdiction over interlocutory orders declining to order arbitration but not over those compelling arbitration. Judicial Improvements and Access to Justice Act, P.L. No. 100–702, § 1019, 102 Stat. 4670–71 (1988), *to be codified at* 9 U.S.C. § 15. Because we decline to assume jurisdiction on this interlocutory appeal over the portion of the district court's order that directed arbitration of Nicholson's state law claims, we need not decide the effect of this new statute on our jurisdiction under 28 U.S.C. § 1292(b).

### IV.

For the reasons set forth above, we will affirm the district court's order declining to compel arbitration of Nicholson's claim under the ADEA.

BECKER, Circuit Judge, dissenting.

I join in Parts I and III of the majority opinion. However, I respectfully dissent from Part II because I believe that arbitration agreements covering claims arising under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621–634 (1982 & Supp. IV 1986), must be enforced pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–15 (1982). In my view, Nicholson has failed to prove that there is anything in the ADEA's text, legislative history or purposes that justifies ignoring the mandate of the FAA.

## I. BARRENTINE, ALEXANDER AND MCDONALD [1]

I agree with the majority that there is no language in the text of the ADEA relevant to the question whether an employee may prospectively waive a judicial forum. Maj.Op. at 224–25. I also agree with the majority's assumption that the Supreme Court's directive to look to the "text" of the statute encompasses examination of both the language and the structure of the Act for the purpose of determining whether Congress intended to preclude waivers of the judicial forum. *Id.* at 224 n. 3. Additionally, I agree with the majority's conclusion that after examination of the text and structure of the ADEA, "further inquiry into the arbitrability of ADEA claims is warranted." *Id.* at 225.

I take issue, however, with the majority's conclusion that *Barrentine v. Arkansas-Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), which held that an individual's Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219 (1982), suit is not barred by prior submission of his grievance to collective bargaining dispute procedures, can provide meaningful guidance as to whether the structure of the ADEA precludes enforcement of an agreement to arbitrate. The majority apparently concedes, Maj.Op. at 225, 229–30 that *Barrentine* is not dispositive, and that neither are two cognate cases on which Nicholson so heavily relies, *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974) (individual's Title VII claim to be considered de novo in court even though claim was grieved through collective bargaining dispute resolution procedures), and *McDonald v. City of West Branch,* 466 U.S. 284, 292, 104 S.Ct. 1799, 1804, 80 L.Ed.2d 302 (1984) ("in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel to effect an award in an arbitration proceed-

ing brought pursuant to the terms of a collective-bargaining agreement"). However, the majority does not squarely address CPC's argument that *Barrentine* is distinguishable from this case. I believe it is important to elaborate on why these cases do not provide meaningful guidance here.

In *Barrentine,* the Supreme Court was faced with the task of reconciling the duty to arbitrate grievances under a collective bargaining agreement pursuant to section 301 of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185 (1982), with the statutory rights of the individual under the FLSA. The inquiry therefore was not whether an individually negotiated arbitration agreement is binding, but rather how best an individual's rights can be accommodated by the machinery of the collective bargaining process.[2] The Court, finding that the legislative history suggested that individuals should not be barred from vindication of these rights by a collective bargaining grievance procedure, rejected the employer's argument that the grievance arbitration should preclude filing suit in court. 450 U.S. at 745–46, 101 S.Ct. at 1447.

Thus, the Court in *Barrentine* faced a very different task than the one before us today. While section 301 of the LMRA and the realities of the collective bargaining process shaped the result in that case, section 301 only applies to collective bargaining agreements and therefore *Alexander, Barrentine,* and *McDonald* are not binding on our result today. *See* Coulson, *Fair Treatment: Voluntary Arbitration of Employee Claims,* 33 Arb.J., Sept. 1978, at 23, 25 ("The often-cited holding in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), would not be applicable [to arbitration outside the collective bargaining context], except as dictum."). Rather, the Federal Arbitration

---

**1.** This dissent is organized to track the major headings in the majority opinion.

**2.** In *Alexander,* on which *Barrentine* heavily relied, the Court explicitly characterized its task as one of "accommodation." *See Alexander,* 415 U.S. at 59–60, 94 S.Ct. at 1025 (holding that "the federal policy favoring arbitration of labor dis-

putes and the federal policy against discriminatory employment practices can best be accommodated by permitting an employee to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under Title VII").

Act controls our result. The Court in *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), delineated our task as follows:

> The Arbitration Act, standing alone, ... mandates enforcement of agreements to arbitrate statutory claims. Like any statutory directive, the Arbitration Act's mandate may be overridden by a contrary congressional command. The burden is on the party opposing arbitration, however, to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue. If Congress did intend to limit or prohibit waiver of a judicial forum for a particular claim, such an intent "will be deducible from [the statute's] text or legislative history," or from an inherent conflict between arbitration and the statute's underlying purposes.

*Shearson*, 107 S.Ct. at 2337 (citations omitted). *See also de Quijas v. Shearson/American Express, Inc.*, — U.S. —, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989).[3]

Neither the majority nor the dissent in *Shearson* at any time cited to either *Alexander, Barrentine,* or *McDonald.* The majority suggests that the Court's silence indicates that *Shearson* did not overrule these cases. Maj.Op. at 224. In my view, the Court's silence bespeaks the fact that these cases are readily distinguishable from the inquiry into the binding effect pursuant to the FAA of an individually negotiated arbitration agreement. *Barrentine,* I respectfully submit, cannot adequately guide us in our inquiry into whether the ADEA contains a "contrary congressional command" to enforcement of the FAA.

The majority looks to *Barrentine* because it explicated what procedures are required under the FLSA in the context of collective bargaining, and the ADEA was derived in part from the FLSA. Even though portions of the FLSA provide some of the ADEA's complicated enforcement mechanisms, this Court has rejected the notion that we should in every instance interpret the "ADEA consistently with the FLSA in areas where the ADEA is not explicit." *Coventry v. United States Steel Corp.*, 856 F.2d 514, 521 n. 8 (3d Cir.1988) (refusing to follow FLSA precedent completely precluding private waivers of ADEA substantive rights). Our ultimate duty therefore under *Shearson* and *Coventry* is to analyze the text, history and the purposes of the ADEA. As the following discussion illustrates, the application of the FLSA in *Barrentine* is not particularly helpful to this inquiry.

The rationales underlying *Barrentine* are either distinguishable from this case or are brought into question by the Court in *Shearson*. In *McDonald*, the Court laid out four justifications for its decision in *Barrentine* and *Alexander*: (1) "[a]n arbitrator may not ... have the expertise required to resolve the complex legal questions that arise in § 1983 actions"; (2) "arbitral factfinding is generally not equivalent to judicial factfinding [because] ... 'the record of the arbitration proceedings is not as complete ... and rights and procedures common to civil trials .. are often severely limited or unavailable' " (3) the arbitrator's job is to enforce the agreement and, even if the public law is in conflict with the bargain, the arbitrator nonetheless must enforce the contract; and (4) in the case of abitration pursuant to a collective

**3.** The Supreme Court in *de Quijas* reconfirmed its strong commitment to enforcement of the Federal Arbitration Act. The majority states that "[t]he *de Quijas* opinion is consistent with the line of cases enforcing arbitration agreements in the setting of business transactions," Maj.Op. at 224, implying that the arbitration agreements in *Mitsubishi* and *Shearson* were enforced because they were in a business setting. I disagree with this reading of the FAA enforcement cases. The Court has never evinced an interpretation of the FAA that would limit its application to commercial settings, and the language of the FAA clearly is not so limited. Under the Court's analysis, the FAA mandates enforcement of private agreements to arbitrate unless contrary congressional intent is shown; whether the agreement is in a business setting is irrelevant. Moreover, it is not clear to me why an arbitration between a securities investor and his brokerage firm is any more in the business setting than an arbitration agreement between a business executive and his employer.

bargaining agreement, "[t]he union's interests and those of the individual employee are not always identical or even compatible. As a result, the union may present the employee's grievance less vigorously, or make different strategic choices, than would the employee." 466 U.S. at 290–91, 104 S.Ct. at 1803 (citations omitted).

The majority concedes that the first two justifications are no longer viable. *See* Maj.Op. at 229; they were expressly rejected by the Court in *Shearson,* as examples of "a general suspicion of the desirability of arbitration and the competence of arbitral tribunals" and are "difficult to reconcile ... with [the] Court's subsequent decisions involving the Arbitration Act." *Shearson,* 107 S.Ct. at 2340. The Court found in *Shearson* and *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), that "arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust [and securities] claims, notwithstanding the absence of judicial instruction and supervision." *Id.; Mitsubishi,* 473 U.S. at 633–34, 105 S.Ct. at 3357. I do not believe that an ADEA dispute presents anymore complexity in terms of facts or law than an antitrust dispute. The adjudications of both may entail a welter of complex statistical and theoretical analyses. Often, however, the ADEA dispute will be simpler.

The Court in *Shearson* also rejected the notion previously asserted in *Wilko v.*

*Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953), that arbitration should not go forward on a statutory claim because there may not be " 'a complete record of [the] proceedings' " *Shearson,* 107 S.Ct. at 2340 (quoting *Wilko,* 346 U.S. at 436, 74 S.Ct. at 187), or because the usual civil trial procedures are not completely available. "[T]he streamlined procedures of arbitration do not entail any consequential restriction on substantive rights." [4] 107 S.Ct. at 2340; *see also Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354. As the Supreme Court recently stated in *de Quijas* that "[t]o the extent that [a court's decision not to enforce an arbitration agreement] rest[s] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants, it has fallen far out of step with our current strong endorsement of the federal statutes favoring this method of resolving disputes." —— U.S. at ——, 109 S.Ct. at 1920.

The third justification, that the arbitrator must enforce the bargain over the public law is also at odds with the Court's later arbitration of statutory rights cases. As the Court in *Shearson* stated, "there is no reason to assume at the outset that arbitrators will not follow the law" 107 S.Ct. at 2340; *see also Mitsubishi,* 473 U.S. at 636–37 & n. 19, 105 S.Ct. at 3358–59, particularly in light of the availability of judicial review.[5] Thus, " '[b]y agreeing to arbi-

---

**4.** In 1978, partly in response to the concerns expressed in *Alexander* with respect to the adequacy of the arbitral forum for determination of discrimination claims, the AAA issued Employment Dispute Arbitration Rules, arbitration rules designed particularly for the purpose of guiding arbitration of individual discrimination claims. *See* Employment Dispute Arbitration Rules, *reprinted in* Coulson, *Fair Treatment: Voluntary Arbitration of Employee Claims,* 33 Arb.J., Sept. 1978, at 23, 25–29; *cf.* AAA, Resolving Employment Disputes, January, 1989 (model employment arbitration procedures). Use of these Rules, which provide for the same scope of discovery and remedies as would be available in court, would obviate at least some of the Court's earlier concerns expressed in *Alexander, Barrentine,* and *McDonald* about the adequacy of arbitration. They are arguably available to Nicholson, who agreed to arbitration governed by " 'the rules of the American Arbitration Asso-

ciation then in effect.' " Maj.Op. at 223 (quoting App. at 107). CPC, in its appendix, submitted a copy of the AAA's Commercial Arbitration Rules; we have no decision or issue before us, however, as to which set of rules was intended to be used by the parties.

**5.** The FAA provides four opportunities for review of the arbitrator's decision. A court may vacate an award
    (a) Where the award was procured by corruption, fraud, or undue means.
    (b) Where there was evident partiality or corruption in the arbitrators, or either of them.
    (c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

trate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " *de Quijas,* —— U.S. at ——, 109 S.Ct. at 1920 (quoting *Mitsubishi,* 473 U.S. at 628, 105 S.Ct. at 3354.

The fourth justification, that arbitration pursuant to a collective bargaining agreement does not sufficiently protect the rights of the individual, in my view, retains its validity post-*Shearson,* but is distinguishable from this case. In *Barrentine,* as well as *Alexander* and *McDonald,* the Court held that an individual's right to pursue a statutory right in federal court was not cut off by arbitration of the substance of the claim pursuant to a collective bargaining agreement. As the Court in *McDonald* pointed out, the union's interests are not identical to the individual's, 466 U.S. at 291, 104 S.Ct. at 1803; *see also Barrentine,* 450 U.S. at 742, 101 S.Ct. at 1445 (the union might not "support the claim vigorously" and might sacrifice individual's interests for collective interests); *Alexander,* 415 U.S. at 58 n. 19, 94 S.Ct. at 1024 n. 19 ("interests of individual employee may be subordinated to the collective interests ... of the bargaining unit"), and therefore the employee may be deprived of *any* forum in which his claim can be vigorously asserted if he is foreclosed from going to court following the union's arbitration of his claim.

In short, the procedural waiver was, at least in some cases, tantamount to a waiver

of substantive rights. As one commentator on the *Alexander* decision has stated:

The Court's willingness to depart from its long pattern of promotion of arbitration makes sense only when one considers the unstated reasons for its decision. Rather than the legislative history, the determinant appears to have been the Court's distrust, based on a lengthy record of failure to prosecute, of the sincerity of unions in dealing with racial grievances.... [T]he union-controlled arbitral process cannot be counted on to vindicate these rights against discrimination. Because arbitrators are generally selected by agreement between employer and union, and receive their compensation from them, institutional pressures are created which render suspect the efficacy of the arbitral process as a remedy for racial discrimination.

Citron, *Deferral of Employee Rights to Arbitration: An Evolving Dichotomy by the Burger Court?,* 27 Hastings L.J. 369, 384 (1975).

This fourth justification for the *Barrentine* line of cases is inapposite to this case. Nicholson was not involved in a collective bargaining agreement or represented by a union. Arbitration in this case is pursuant to an agreement entered into and signed by the party asserting his statutory rights. A union has not interposed a grievance procedure not individually suited to him and he need not rely on a third party such as a union for the vigorous representation of his rights.[6]

---

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10. While arbitrators are limited as to what they may consider by the scope of the arbitration clause, in instances of an unrestricted submission, such as in this case, the arbitrator's decision is reviewed for "manifest disregard" of the law. *See Wilko,* 346 U.S. at 436–37, 74 S.Ct. at 187–88 (setting out manifest disregard standard where arbitrator decides legal issue). In light of the Court's statement in *Shearson* that "such review is sufficient to ensure that arbitrators comply with the requirements of the statute," 107 S.Ct. at 2340, I do not believe that we are free now to assert that arbitration is necessarily an inadequate forum for

the vindication of statutory rights absent proof of contrary congressional intent.

**6.** The majority cites to three cases in other courts of appeals supporting its conclusion that the ADEA overrides the FAA. Maj.Op. at 229–30. In *Swenson v. Management Recruiters Int'l, Inc.,* 858 F.2d 1304, 1305–07 (8th Cir.1988), the Court of Appeals for the Eighth Circuit refused to enforce an arbitration agreement with respect to Title VII claims, because it perceived that arbitration is "poorly suited as a forum for the final resolution of rights created by Title VII," relying on *Alexander.* Because I believe that the mistrust of arbitral proceedings reflected in *Alexander* has been largely undercut by *Mitsubishi, Shearson,* and *de Quijas,* and the court in *Swenson* offered no other justification for its conclusion, I do not find *Swenson* per-

To summarize, *Barrentine* does not support a conclusion in this case that the mandate of the FAA has been overridden. First, the task in *Barrentine*, accommodation of individual rights in the context of the collective labor machinery, is very different from the task required under *Shearson* of determining whether the ADEA overrides the FAA's mandate to enforce private arbitration agreements. Second, the rationales underlying *Barrentine* are either undercut by *Shearson* or clearly distinguishable from this case. *Barrentine*'s distrust of the arbitral process is rejected in *Shearson;* and Nicholson entered into his arbitration agreement individually, not through a union or collective bargaining agreement, and will individually pursue his claim.

## II. LEGISLATIVE HISTORY; THE 1978 AMENDMENT OF THE ADEA

As the majority notes, there is no reference to arbitration in the legislative history of the ADEA. The majority asserts, however, that the 1978 amendment adding a provision for the tolling of the statute of limitations provides an indication that judicial resolution is preferred. The majority states that "Congress intended that extrajudicial methods of seeking resolution of age discrimination claims should not impede ultimate resolution of those claims in a judicial forum when extrajudicial methods proved inadequate." Maj.Op. at 226. I do not draw the same conclusion from the legislative history of the amendment.

As the majority correctly points out, the amendment was intended to make certain that age discrimination claims reached an adjudicatory forum "in the event the conciliation process fails" or in the event "those who have violated the Act [delay and postpone] ... conciliation and thereby possibly

avoid[ ] liability." S.Rep. No. 493, 95th cong., 1st Sess. 13 (1977), *reprinted in ADEA History* at 446. I do not believe that this language means that the Congress was concerned that extrajudicial methods must not "impede ultimate resolution of those claims in a judicial forum." Maj.Op. at 226. Rather, the more logical inference in my view is that Congress passed the tolling amendment because it was concerned about the abuse of the extrajudicial methods which impeded *any* resolution of those claims. Thus, the amendment was passed in response to fears that employers were improperly stalling conciliation attempts beyond the statute of limitations. The tolling provision was added to ensure that claimants achieved resolution of their claims despite delays and not, as the majority suggests, because informal mechanisms were perceived as inherently inferior to judicial resolution. Therefore, the history supports no conclusion with respect to congressional preference for a judicial forum over a nonjudicial forum, and hence I disagree with the majority that the legislative history is "suggestive" of a congressional intent to preclude waiver of a judicial forum and to override the mandate of the FAA. *See* Maj.Op. at 227.

## III. INHERENT INCOMPATIBILITY

The majority holds that the objectives of the ADEA are inherently incompatible with waiver of a judicial forum and enforcement of a private arbitration agreement. First, the majority asserts that the administrative scheme of the ADEA evidences congressional intent that the EEOC should not be precluded from involvement in a case by arbitration and that the EEOC cannot regulate arbitration in the way that the SEC can, making *Shearson* distinguishable.

---

suasive. Of course, whether the legislative history of the Civil Rights Act of 1964 or other concerns peculiar to that Act might warrant a conclusion that Congress did not intend that courts enforce agreements to arbitrate Title VII claims is an issue not before us in this case.

*Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1553 (10th Cir.1988), extended *Alexander* to the ADEA without addressing the distinction between arbitration pursuant to a collective bar-

gaining agreement and arbitration pursuant to a individually negotiated agreement to arbitrate. *Criswell v. Western Airlines, Inc.*, 709 F.2d 544 (9th Cir.1983), *aff'd on other grounds*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985), extended the *Alexander, Barrentine, McDonald* line of cases to claims involving the ADEA in the context of a collective bargaining agreement, hence it is inapposite.

Second, the majority asserts that an arbitrator's powers and the arbitral forum are inadequate to achieve the goals of the ADEA. Third, the majority would take into account in determining whether the ADEA overrides the FAA the disparity in bargaining power between Nicholson and CPC.

I do not believe that the majority has accurately characterized the role of the EEOC, the power of an arbitrator to craft equitable relief, or our role in evaluating the agreement. I therefore do not believe the majority, or Nicholson, has persuasively shown that the ADEA is inherently incompatible with enforcement of private arbitration agreements pursuant to the FAA.

A. *The Administrative Scheme of the ADEA*

The majority describes the many activities in which the EEOC is engaged, e.g., investigation, inspection of records, taking measures to secure enforcement and concludes that there is a clear congressional "intent that compliance with the ADEA be overseen by a public agency." Maj.Op. at 227. I find this logic unpersuasive. The mere fact of the EEOC's many activities does not compel the conclusion that Congress intended that the EEOC must be involved in every instance of age discrimination in this country. The SEC is heavily involved in the enforcement of the Securities Exchange Act of 1934, but the Supreme Court did not find that the SEC's elaborate administrative scheme in itself precluded enforcement of private arbitration agreements in *Shearson*.

Significantly, the EEOC itself has made a formal proposal that courts enforce voluntary nonprospective waivers of all substantive ADEA rights without EEOC su-

pervision, which would effectively circumvent EEOC involvement. *See* 29 C.F.R. 1627.16(c) (1988).[7] Thus, the EEOC itself does not support the majority's conclusion that all compliance with the ADEA, according to congressional intent, must be overseen by the EEOC. More importantly, this Court recently held that an aggrieved party may voluntarily and knowingly settle his ADEA claims without the involvement of the EEOC, indicating that private resolution absent EEOC involvement is not in derogation of the text, history or purpose of the ADEA. *See Coventry*, 856 F.2d at 522 n. 8.

In *Coventry*, we stated that:

the legislative history reflects the intent of the act's sponsors to achieve swift disposition of disputes and to avoid delays which, as one sponsor noted, "plague so many of our agencies, such as the EEOC and the NLRB. The EEOC, for example, is already years behind in disposing of its docket. Such delay is always unfortunate, but is particularly so in the case of older citizens to whom, by definition, relatively few productive years are left." ... Another sponsor of the legislation ... noted that the Act should allow the employee to "resolve the dispute himself or work out a compromise with an employer."

*Id.* (citations omitted). I conclude therefore that the ADEA does not support the assertion that the EEOC must be or was intended to be necessarily involved in all or most age discrimination disputes.

I also question what I understand to be the majority's presumption that enforcement of Nicholson's arbitration agreement effectively bypasses the EEOC's procedures. *See* Maj.Op at 227 ("Any procedure

---

7. As the majority points out, this proposal has recently been suspended for the purpose of congressional hearings on the topic. *See* Maj.Op. at 230 n. 10. The suspension expires Sept. 30, 1989. *See* Pub.L. No. 100–459, Title V, 102 Stat. 2216 (1988). Hearings on the proposed standard at which the EEOC has testified in favor of its proposal are ongoing; legislation intended to replace the EEOC regulations has been proposed by the House and the Senate. *See* H.R. 1432, 101st Cong., 1st Sess., 135 Cong.Rec. E816 (daily ed. March 15, 1989); S. 54, 101st Cong.,

1st Sess., 135 Cong.Rec. S356 (daily ed. Jan. 25, 1989). The EEOC proposal and the proposed bills do not address the issue of whether a waiver of the procedural forum would be permissible, but only address waivers of substantive rights under the ADEA after the alleged discrimination has taken place. Thus, aside from the fact that the EEOC's support of such nonsupervised waivers supports the inference that the EEOC need not be involved in enforcement of the ADEA, the proposal does not provide guidance for our result in this case.

that detracts from the EEOC charge requirement would undermine Congress' design."). The facts of this case run counter to this conclusion. Before suit was filed, Nicholson filed a charge with the EEOC following the ordinary ADEA procedural requirements, but ultimately withdrew his charge so that he could proceed individually. The EEOC thus had the opportunity to enter into conciliation, to file suit, and necessarily received the information with respect to this case that the majority asserts is necessary for the EEOC's effective oversight of age discrimination in this country. *See id.* In fact, with respect to the EEOC, the course of this suit is no different than any other in which either the party withdraws its charge or the EEOC decides not to sue. In those instances, pursuit of the claim is the prerogative of the individual plaintiff. In this instance, the plaintiff agreed to arbitration in lieu of a court proceeding. Thus, the EEOC's involvement is not lessened because an arbitration agreement has been signed.

Moreover, even though Nicholson withdrew his charge, the EEOC has the independent authority as the enforcement agency of the ADEA to continue its investigation and to pursue whatever remedies it deems necessary resulting from alleged age discrimination by CPC. *See* 29 U.S.C. § 626(b); 29 C.F.R. §§ 1626.4, 1626.13 (1988). After withdrawal of a charge, the EEOC retains its independent investigative authority. *See* 29 C.F.R. 1626.13 (Under the ADEA "the Commission has independent investigative authority [and] may continue any investigation and may secure relief for all affected persons notwithstanding a request by a charging party to withdraw a charge."). Indeed, Nicholson has

not signed away the EEOC's power to bring suit under the ADEA (nor could he) and CPC makes no argument that he has (or can). Rather, he has only signed away his individual right to bring suit, a right which is secondary to the enforcement powers of the EEOC. *See Rogers v. Exxon Research and Engineering Co.*, 550 F.2d 834, 841 (3d Cir.1977) ("The thrust of the ADEA's enforcement provisions is that private lawsuits are secondary to administrative remedies and suits brought by the [EEOC].") *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 770 (1978). The arbitration agreement does not immunize CPC from EEOC's exercise of its enforcement obligations. Therefore, Nicholson's arbitration agreement does not undercut the EEOC's involvement with or oversight of ADEA claims.

The majority also states that "[em]ployees and lawyers for employees will have little incentive to file charges of age discrimination with the EEOC if they cannot thereafter proceed to a judicial forum but instead must arbitrate their claims...." Maj.Op. at 227. This is an empirical statement for which the majority does not provide the basis. However, to the extent that an employee believes that an arbitral forum is less favorable to ADEA claims than a judicial forum, it would seem to me that the employee would have an incentive to seek EEOC assistance in a case in which access to a judicial forum is foreclosed to him through enforcement of an arbitration agreement.[8]

With respect to the right to bring a charge to the EEOC even though a party has signed an arbitration agreement. I think it is notable that CPC has not argued

---

8. The majority also asserts that enforcing arbitration agreements will deprive the EEOC of "the charge as a triggering mechanism." Maj.Op. at 227. The EEOC's investigative powers, however, can be triggered by *any* report of discrimination. *See* 29 C.F.R. § 1626.4 (1988) ("The Commission shall also receive information concerning alleged violations of the Act, including charges and complaints, from any source."). Thus, even if the particular individual who has agreed to arbitrate her discrimination claims fails to report the alleged discrimination to the EEOC, others may do so. More-

over, the EEOC "may, on its own initiative, conduct investigations." *Id.* Thus, involvement of the EEOC in cases of alleged age discrimination does not turn on whether individual victims of alleged discrimination themselves file claims with the EEOC. Moreover, the EEOC's proposed regulation and the current bills before both the House and Senate, *see supra* note 7, would permit employers and employees to effect nonsupervised settlements of ADEA claims, although such settlements would, under the majority's reasoning, deprive the EEOC of a charge-triggering mechanism.

that Nicholson acted improperly by going to the EEOC before entering into arbitration. Regardless of the scope of the arbitration agreement, an aggrieved party may not be precluded from filing a charge with the EEOC. *See EEOC v. Cosmair, Inc.*, 821 F.2d 1085, 1089–90 (5th Cir.1987) (waiver of right to file charge with EEOC is void as against public policy). Because Nicholson does not have the power to sign away the EEOC's enforcement powers and cannot be precluded from bringing a charge, the arbitration agreement only secures a promise that if Nicholson acts on his own behalf, he will do so in an arbitral forum, not a court. Thus, the avenue to the EEOC is left open even after an arbitration agreement is signed.

In sum, I believe that the majority has significantly overstated the consequences to EEOC involvement and enforcement arising from an individual's decision to agree to arbitration of ADEA claims. I would not conclude on this ground that enforcement of Nicholson's arbitration agreement runs counter the purposes of the ADEA.

Buttressing its conclusion that arbitration of ADEA claims is not appropriate, the majority asserts that the EEOC has no power to regulate arbitration proceedings like the power conferred on the SEC as discussed in *Shearson*. Maj.Op. at 228 & n. 6. First, I do not believe that the power of an administrative agency to regulate arbitration can be dispositive of whether the FAA will be enforced. There is no administrative agency issuing regulations with respect to or overseeing either RICO or antitrust arbitrations, but the Court has found that arbitration was acceptable in those cases. *See Shearson*, 107 S.Ct. at 2346; *Mitsubishi*, 473 U.S. at 632–37, 105 S.Ct. at 3356–59.

Second, I believe that the majority has misconstrued the Court's discussion of the power of the SEC in *Shearson*. In *Shearson*, the Court justified its severe undermining of the *Wilko* decision in part on the basis that the SEC "had only limited authority over the rules governing self-regulatory organizations (SROs)" at the time of the *Wilko* decision, but now has "expansive power to ensure the adequacy of the arbitration procedures employed by the SROs." *Shearson*, 107 S.Ct. at 2341. The majority seems to assume that the Supreme Court implied that the Congress must explicitly grant the power to oversee arbitration for the administrative agency charged with carrying out the dictates of the Act to engage in rulemaking with respect to arbitration. That, however, is not my understanding of the discussion of the SEC's powers in *Shearson*.

I believe that the Court was emphasizing not that the SEC had a new-found power to regulate arbitration of securities claims, but rather that Congress had extended the SEC's power to govern self-regulatory organizations, which in turn oversaw arbitration. Thus, I do not think that we need conclude from *Shearson* that the Congress must explicitly delegate rulemaking authority with respect to arbitration. To the contrary, and despite the majority's protestations, *see* Maj.Op. at 228 n. 6, there is no language in the Securities Exchange Act sections cited by the Supreme Court, sections 78s(b)(2) and (c), expressly granting the power to regulate arbitration. Rather, the provisions provide broad ranging power for the SEC to oversee and review all of the rules implemented by self-regulatory organizations.

Similarly, the EEOC has been given broad ranging power with respect to implementation of rules and regulations administering the ADEA. *See* 29 U.S.C. § 628 (the EEOC "may issue rules and regulations as it may consider necessary or appropriate for carrying out this chapter"). Since Congress clearly has the power to preclude arbitration of statutory claims, *see Shearson*, 107 S.Ct. at 2337, it is reasonable to believe that where Congress has not precluded waiver of the judicial forum and therefore arbitration is permissible, the administrative agency (given broad regulatory authority) may reasonably infer that the governance of arbitration of the statutory claims was delegated by Congress and therefore it may regulate how arbitration may be conducted with respect to those claims. *See generally United States v.*

*Frank,* 864 F.2d 992, 1010–11 (3d Cir.1988) (discussing delegation doctrine). I believe, therefore, that the EEOC may regulate arbitration of ADEA claims, i.e., that the EEOC is free to promulgate regulations to assist and guide those engaged in arbitration of ADEA claims in order to effect the aims of the ADEA.[9]

One possible response to this contention is that even if the EEOC issued regulations with respect to arbitration of ADEA claims, it would not have the means to police private arbitration of ADEA claims. Yet this is also true of the SEC. As Justice Blackmun in his partial dissent in *Shearson* pointed out, the SEC "neither polices nor monitors the results of these arbitrations for possible misapplication of securities laws or for indications of how investors fare in these proceedings." *Shearson,* 107 S.Ct. at 2357. Therefore, I do not believe that the power to police is necessary to a finding that the EEOC has sufficient power to issue regulations relating to the conduct of arbitrations in the ADEA context.

The EEOC's power to regulate arbitration of ADEA claims would be somewhat different from the SEC's powers to regulate arbitration; "the SEC has specifically approved the arbitration procedures of the New York Stock Exchange, the American Stock Exchange, and the National Association of Securities Dealers," *Shearson,* 107 S.Ct. at 2341, exercising its regulatory power over each of the self-regulatory organizations. The EEOC's power would be more direct as there is no intermediate organization issuing arbitration rules. I conclude, therefore, that Nicholson's and the majority's attempt to distinguish this case from *Shearson* on the basis of the EEOC's purported inferior powers to regulate arbitration of ADEA claims is unavailing.

B. *The Powers of the Arbitrator and the Possibility of Collective Action*

The majority asserts that arbitration of an individual's ADEA claim is unacceptable, because arbitrators lack the broad equitable powers of courts under 29 U.S.C. § 626(b) relating to other employees and because the ADEA provides for the possibility of collective action under 29 U.S. C. § 216(b). Maj.Op. at 228–29. The majority concludes that arbitrators are therefore incapable of eliminating discrimination as effectively as courts and the EEOC. *Id.* at 229. I disagree.

First, the rules of the AAA provide explicitly for the provision of broad equitable remedies by an arbitrator. *See* AAA, Commercial Arbitration Rules, Rule 43, Scope of Award (1988) ("The arbitrator may grant *any* remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties....") (emphasis added).[10] Where the scope of the agreement is broad and includes statutory disputes, as this one does, I believe that the arbitrator's powers are sufficient to provide redress for the injuries caused.[11] I conclude therefore that arbitrators are no less capable of effecting the goal of the ADEA of eliminating age discrimination than courts or the EEOC in the case of arbitration pursuant to a broad arbitration clause.

Second, arbitrations may in fact go forward as class actions. *See generally* M. Hill & A. Sinicropi, *Remedies in Arbitration* 240–41 (1981).[12] If a class action arbitration were to go forward, relief would

---

**9.** There have been proposals that the EEOC set up its own arbitration procedure. *See generally* Edwards, *Arbitration as an Alternative in Equal Employment Disputes,* 33 Arb.J., Dec. 1978, at 22, 25–26.

**10.** The AAA Employment Dispute Arbitration Rules provide explicitly for remedies as broad as those available in court: "The Arbitrator may grant any remedy or relief that a court having jurisdiction of the matter could grant, provided it is within the scope of the parties' submission agreement," but precludes class relief. *See supra* note 4, Rule 25, Scope of Award.

**11.** In contrast, the scope of the arbitration clause in *Alexander* was limited to the terms of the collective bargaining agreement. *See Alexander,* 415 U.S. at 42, 94 S.Ct. at 1016. ("'arbitrator's decision must be based solely upon an interpretation of the provisions of this Agreement'").

**12.** While Nicholson has agreed to *arbitrate* his claims pursuant to the rules of the American Arbitration Association, he has not agreed to go forward alone and has not agreed not to proceed on the basis of a class action arbitration.

presumably have to be tailored to each individual claimant. *See supra* note 10 (AAA Employment Dispute Resolution Rules preclude class relief). I also presume that the class action arbitration could not bind those who have not consented to arbitration, but neither can a class action pursuant to § 216(b) undertaken in court bind parties without their consent. *See Sperling v. Hoffman–La Roche Inc.*, 862 F.2d 439, 444, 446 (3d Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1526, 103 L.Ed.2d 832 (1989).

However, even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the Act provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred. Section 216(b) provides an opportunity to proceed collectively, not "an invitation to plaintiffs that they could not refuse." *Bird v. Shearson Lehman/American Express, Inc.*, 871 F.2d 292, 299 (2d Cir.1989) (Cardamone, J., dissenting).

In sum, I do not find that the majority's assertion about the insufficiency of the arbitrator's remedial powers or its assertion about the possibility of collective action militates against the enforcement of agreements to arbitrate ADEA claims.[13]

C. *The Standard Governing Waivers of the Procedural Forum*

I have now explained at some length why I believe that waiver of the judicial forum is not precluded by the ADEA. In view of that position, I must be sensitive to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds " ' "for revocation of any contract." ' " *See Shearson*, 107 S.Ct. at 2359 (Blackmun, J., dissenting) (quoting *Mitsubishi*, 473 U.S. at 627, 105 S.Ct. at 3354 (quoting 9 U.S.C. § 2))). I therefore think it necessary, in the interest of complete expression of my dissenting views, that I address the issue of what standards should govern procedural waivers, which would have to be addressed under my approach to this case.

Under ordinary contract principles, waivers must generally be knowing and voluntary to be enforceable. *See Coventry*, 856 F.2d at 521 (" ' "waiver" . . . connotes some kind of voluntary knowing relinquishment of a right' ") (quoting *Green v. United States*, 355 U.S. 184, 191, 78 S.Ct. 221, 226, 2 L.Ed.2d 199 (1957))). The Court in *Mitsubishi* and *Shearson*, applying the language of the FAA, 9 U.S.C. § 2 (arbitration agreements are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract"), set the standard of ordinary contract principles for waivers of procedural rights where the governing statute does not indicate otherwise. "[A] well-founded claim that an arbitration agreement resulted from the sort of

---

In fact, the agreement does not speak to the form his arbitration may take.

**13.** I also believe there is a fundamental inconsistency afflicting the majority's opinion. The majority states that "[n]othing in this opinion precludes an employee from voluntarily arbitrating his or her age discrimination claim." Maj.Op. at 229 n. 9. At no point, however, does the majority explain why parties should be permitted to bypass the EEOC voluntarily but be precluded from bypassing the EEOC through enforcement of an arbitration agreement. On the majority's own terms, any bypassing of the EEOC is impliedly disapproved by Congress. The majority asserts that the EEOC must be involved in the elimination of age discrimination, Maj.Op. at 227–28, and concludes that arbitration cannot satisfactorily effect the goals of the ADEA. The reasons set forth by the majority justifying its conclusion that arbitration

agreements should not be enforced are as compelling with respect to voluntary arbitration as they are with respect to compulsory arbitration arising out of an agreement to arbitrate. Thus, I believe that the reasoning of the majority logically calls for a ban on arbitration of ADEA claims at any time, even when the employee voluntarily enters into arbitration. Yet that, I am certain, was not the intent of Congress. *See Coventry*, 856 F.2d at 522 n. 8 (ADEA sponsor "noted that the Act should allow the employee to 'resolve the dispute himself or work out a compromise with an employer' " (citation omitted)); Note, *Waiver of Rights Under the Age Discrimination in Employment Act of 1967*, 86 Colum.L.Rev. 1067, 1079 ("incorporation of Title VII's conciliation provision [into ADEA] should . . . be interpreted as reflecting a favorable attitude toward *all* recognized mechanisms of out-of-court dispute resolution").

fraud or excessive economic power that 'would provide grounds "for the revocation of any contract" ' " could result in revocation of the arbitration agreement. *Shearson*, 107 S.Ct. at 2337 (quoting *Mitsubishi*, 473 U.S. at 627, 105 S.Ct. at 3354 (quoting *Wilko*, 346 U.S. at 432, 74 S.Ct. 182)); *see also de Quijas*, — U.S. at —, 109 S.Ct. at 1921. Therefore, despite my belief that waivers of the judicial forum are not precluded by the ADEA, I believe careful attention would have to be paid in procedural waiver cases to these basic contract principles.[14]

We delineated what is meant by "voluntarily and knowingly" in *Coventry:*

> whether a waiver has been 'knowingly and willfully' made has been predicated upon an evaluation of several indicia arising from the circumstances and conditions under which the release was executed. Among those factors ... are general principles of contract construction such as the clarity and lack of ambiguity of the language ... and the absence of fraud or undue influence.

856 F.2d at 522 (citations omitted); *see also Lancaster v. Buerkle Buick Honda Co.*, 809 F.2d 539, 541 (8th Cir.) (ADEA substantive waiver valid where there was no "exploitation or overreaching"), *cert. denied*, 482 U.S. 928, 107 S.Ct. 3212, 96 L.Ed.2d 699 (1987); *Moore v. McGraw Edison Co.*, 804 F.2d 1026, 1033 (8th Cir.1986) (ADEA sub-

stantive waiver valid "in the absence of fraud, deceit or unconscionable overreaching"); *cf. de Quijas*, — U.S. —, 109 S.Ct. at 1921–22 (dictum suggesting that an agreement to arbitrate is established as "adhesive in nature" might not be enforced).[15]

The majority intimates that the disparity in bargaining power between age discrimination claimants and employers may be insufficient to void the contract to arbitrate, and then states that "we cannot close our eyes to the realities of the workplace." Maj.Op. at 229. I certainly agree that the relative bargaining powers of the parties is relevant to consideration whether to enforce a contract to arbitrate. That is one of the necessary criteria in determining whether a contract was entered into voluntarily and knowingly. *See supra* at 241–42. I would urge district courts to enter into that inquiry with care in the context of age discrimination cases. I do not believe, however, that in the context of enforcement of an arbitration agreement the mere fact of a disparity of bargaining power is dispositive.

Even if there is a disparity in bargaining power between the employer and the employee when the arbitration agreement is entered into, and, as the majority points out, there often may be, enforcement of the arbitration agreement is not at odds with ADEA's text, legislative history or

---

**14.** In *Coventry*, we held that settlements of ADEA claims could be effected through private waivers of substantive ADEA rights unsupervised by the EEOC. 856 F.2d at 522. Examining the purposes of the ADEA, we concluded that waivers of substantive rights should not only be judged under the standard contract principles of voluntary and knowing waivers, but also according to the totality of the circumstances. *Id.* at 523. *Compare Runyan v. National Cash Register Corp.*, 787 F.2d 1039, 1045 (6th Cir.) (substantive waivers judged under standard contract principles), *cert. denied*, 479 U.S. 850, 107 S.Ct. 178, 93 L.Ed.2d 114 (1986). It was on the basis of the "strong policy concerns to eradicate discrimination in employment," that we determined that waivers of substantive rights must be judged under the "totality of the circumstances, considerate of the particular individual who has executed the release." *Coventry*, 856 F.2d at 522–23. Because the purposes of the ADEA are not frustrated by arbitration, as I have concluded, the policy concern expressed in *Coventry* of

achieving eradication of discrimination is satisfied and therefore we need not adopt *Coventry's* higher standard for procedural waivers.

**15.** Nicholson does not argue that the agreement to arbitrate was ambiguous or signed by him as a result of fraud and undue influence. Rather, Nicholson argued before the district court that the entire agreement was entered into "under duress and undue influence, and that the agreement was unsupported by consideration." As the district court noted, the Supreme Court "drew a distinction between fraud in the inducement of an agreement to arbitrate and fraud in the inducement of a contract which contains a promise to arbitrate. While the former is for a federal court to determine, the latter is for an arbitrator." Dist.Ct.Op. at 5, C.A. No. 88–45, 1988 WL 35382 (Apr. 18, 1988) (citing *Prima Paint Corp. v. Flood & Conklin Manufacturing*, 388 U.S. 395, 403–04, 87 S.Ct. 1801, 1085–06, 18 L.Ed.2d 1270 (1967)).

purposes. As explained *supra*, there is no ADEA text or legislative history directly on the issue of arbitration and therefore none on whether the disparity in bargaining power between the parties counsels against enforcement. However, the purpose of the ADEA bears careful examination.

As the majority points out, the central purpose of the ADEA is the elimination of age discrimination. This purpose is reiterated in the statute. *See* 29 U.S.C. § 621(b) (purpose of ADEA is "to prohibit arbitrary age discrimination in employment"). As I discuss *supra*, the goal of eliminating discrimination is not undermined by arbitration and judicial review thereof, which sufficiently vindicate an individual's rights. Moreover, the EEOC's enforcement powers are not undermined by the enforcement of an agreement to arbitrate. As I have explained, Nicholson has not through his arbitration agreement bartered away or diluted his right to relief in the event of age discrimination committed against him. Therefore, even where there is some disparity in bargaining power, as there is in virtually every contractual relationship, the central purpose of elimination of arbitrary age discrimination has not been defeated or undercut by enforcement of arbitration.

But that does not end our inquiry. We must also ask whether the ADEA has a secondary purpose of monitoring enforcement of arbitration agreements into which parties have freely entered and of invalidating agreements to arbitrate because the employee was at a bargaining disadvantage from the employer. I think not, and believe that the following hypothetical helps explain my conclusion. A civil rights statute could be passed with the intent that federal courts provide exclusive federal jurisdiction, because state courts historically were not providing adequate protection of civil rights. Presumably, an agreement signed by a person protected by the statute, waiving his or her right to go to federal court in favor of state court, would not be enforced, because enforcing the agreement in that instance would completely undermine the purpose of the act. In that instance, Congress would have evinced an intent to intervene in the normal contracting relationship, refusing to permit enforcement of an agreement bargaining away the right to go to federal court and creating in effect an irrebuttable presumption of an improper disparity in bargaining power where parties negotiate over the appropriate forum. Such a statute could be said to have two central purposes, guaranteeing a right to a federal forum for vindication of civil rights and elimination of discrimination. The ADEA does not share the first purpose, but only the second: elimination of discrimination. Because its goals can be effectively achieved through a variety of forums and through individual bargaining as to the proper forum, I cannot conclude that the ADEA prohibits normal market forces to operate where parties bargain over this type of forum-selection clause.

In fact, there is legislative history to support the conclusion that Congress intended the ends of the ADEA to be achieved simply by bargaining between employee and employer without supervision by any sort of neutral arbiter. *See Coventry*, 856 F.2d at 522 n. 8 ("The Act should allow the employee to 'resolve the dispute himself or work out a compromise with an employer.'" (quoting Sen. Williams, 123 Cong.Rec. S17275 (daily ed. Oct. 19, 1977)). The purpose of the ADEA, in my view, is not to prevent employees from bargaining away their procedural forums (as opposed to substantive rights) such that any disparity in bargaining power will automatically void an individually negotiated agreement, but rather to find an end to age discrimination through private enforcement and EEOC enforcement. Similarly, the Court in *Shearson* found that the potential for broker overreaching could be grounds for revocation, but concluded that it was insufficient to void the arbitration agreement under ordinary contract principles. 107 S.Ct. at 2339; *de Quijas*, —— U.S. at ——, 109 S.Ct. at 19205 (right to select forum is waivable despite "rationale that the Securities Act was intended to place buyers of

securities on an equal footing with sellers").

The majority's concern that an "employee may not have fully anticipated" the future dispute, *see* Maj.Op. at 230, is not in my view a factor going to whether arbitration should be enforced in general, but more appropriately a factor to be considered by the court when it addresses the issue of whether the waiver was voluntary and knowing in the particular case. *See, e.g., Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d 282, 287 (9th Cir.1988) (addressing claim that agreement was not entered into voluntarily).

The majority's concern that the dispute may not have been anticipated is an oblique criticism of the fact that the waiver in this case is prospective. In general, substantive rights cannot be waived prospectively. *See Coventry,* 856 F.2d at 522–25 (permitting waiver of substantive rights at the time of settlement, after discrimination has occurred); S. 54, 101st Cong., 1st Sess. § (f)(2)(B) (1989) (settlement of substantive rights may only occur if "the agreement does not waive rights or claims that may arise after the date the agreement is entered into"); H.R. 1432, 101st Cong., 1st Sess. § (f)(2)(B) (1989); *see also Alexander,* 415 U.S. at 51, 94 S.Ct. at 1021 (waiver of individual's procedural rights tantamount to waiver of substantive rights cannot be entered into by union prospectively). However, the FAA permits waiver of *procedural* rights in favor of arbitration both prospectively and nonprospectively. *See* 9 U.S.C. § 2 (applying to "[a] written provision ... to settle by arbitration a controversy thereafter arising out of such contract ... or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract"). Moreover, waiver of the judicial forum in favor of arbitration is not in itself a "restriction on substantive rights," *Shearson,* 107 S.Ct. at 2340, but rather " 'a specialized kind of forum-selection clause.' " *de Quijas,* — U.S. at —, 109 S.Ct. at 1921 (quoting *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974)). Therefore, unless Nicholson has succeeded in proving that the ADEA

evinces an intent contrary to the FAA's permission of prospective procedural waivers, I do not believe the fact that this waiver is prospective is dispositive. I do not believe that Nicholson has succeeded in this task and the majority makes no argument that would undermine this conclusion.

I therefore would apply general contract principles and conclude that if enforcement of an agreement to arbitrate was entered into voluntarily and knowingly, it does not undermine the goals of the ADEA and we must enforce it despite a disparity in bargaining power.

## IV. CONCLUSION

In summary, " '[t]here is nothing in the record before us, nor in the facts of which we can take judicial notice, to indicate that the arbitral system ... would not afford the plaintiff the rights to which he is entitled.' " *de Quijas,* — U.S. at —, 109 S.Ct. at 1921 (quoting *Wilko,* 346 U.S. at 439, 74 S.Ct. at 189 (Frankfurter, J., dissenting)). None of the majority's arguments in support of a congressional intent to preclude enforcement of the FAA with respect to ADEA claims is convincing and Nicholson has failed to carry his burden in this regard. Where no contrary congressional intent has been shown, we are constrained to " 'rigorously enforce agreements to arbitrate.' " *Shearson,* 107 S.Ct. at 2337 (quoting *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985)). I would therefore enforce Nicholson's agreement to arbitrate his ADEA claim and direct the district court to stay its proceedings accordingly.