356 F.2d 332
 SOUTHERN PACIFIC COMPANY, a corporation, Order of Railway
Conductors and Brakemen, a voluntary association, General
Committee of Adjustment, Order of Railway Conductors and
Brakemen, a voluntary association, G. P. Lechner, General
Chairman, Order of Railway Conductors and Brakemen,
Brotherhood of Railroad Trainmen, a voluntary association,
General Committee, Brotherhood of Railroad Trainmen, a
voluntary association, J. J. Corcoran, General Chairman,
Brotherhood of Railroad Trainmen, Appellants,
v.
SWITCHMEN'S UNION OF NORTH AMERICA, AFL-CIO, a voluntary
association, et al., Appellees.
 No. 19438.
 United States Court of Appeals Ninth Circuit.
 July 20, 1965, On Rehearing Feb. 21, 1966.
 
 William R. Denton, Waldron A. Gregory, San Francisco, Cal., for appellant Southern Pac. Co.
 Warren H. Saltzman, Littler, Mendelson & Saltzman, San Francisco, Cal., for appellants Order of Ry. Conductors, etc.
 Clifton Hildebrand, Hildebrand, Bills & McLeod, Oakland, Cal., for appellants Brotherhood of Ry. Trainmen, etc., and Corcoran.
 Clifford D. O'Brien, Portland, Or., Ruth Weyand, Washington, D.C., for appellees.
 Before ORR, MERRILL and BROWNING, Circuit Judges.
 MERRILL, Circuit Judge:
 
 
 1
 At the heart of the dispute which we here face is the question of who shall be employed in the newly established yards of the Southern Pacific Company at City of Industry, California: the members of the Brotherhood of Railroad Trainmen (BRT), or the members of the Switchmen's Union of North America (SUNA). Under the terms of collective bargaining contracts between Southern Pacific and these unions, the members of BRT are entitled to such employment and the members of SUNA are not. SUNA is engaged in an effort to take this employment from BRT and secure it for its own members. The immediate question is whether they can compel Southern Pacific to bargain with them on a proposed change in their agreement which would directly accomplish this end. The District Court held that they could. We here reverse.
 
 
 2
 The affected members of both unions perform the same type of work-- switching work. However, for purposes of collective bargaining representation, switching work does not itself constitute a single craft. It is divided into 'yard work' and 'road work.' This division was accomplished by agreement between the unions and Southern Pacific in 1934. By that agreement the craft classifications were defined. 'Yard work' is switching work done in and about certain designated yards (of which there are about forty), which are sometimes referred to as 'closed yards,' and whose geographical limits are sometimes referred to as 'switching limits.' Over these yards, SUNA, by collective bargaining agreement, has representational jurisdiction. 'Road work' is switching work done outside of the geographical limits of the designated 'closed yards,' and over road work, BRT, by collective bargaining agreement, had representational jurisdiction.
 
 
 3
 The Los Angeles yard is a closed yard. For its own and its shippers' convenience the Southern Pacific has recently established a new yard at City of Industry, near Los Angeles. The present dispute was precipitated by the proposal of the railroad to transfer to City of Industry some of the work which was then being done in the Los Angeles yard. The City of Industry yard is not a designated closed yard and thus, by definition, the work which is done there is road work and is performed by members of BRT.
 
 
 4
 Faced with the prospect of loss of employment by its members, SUNA commenced the present proceedings, seeking to enjoin Southern Pacific from transferring work from the Los Angeles yard. SUNA also served on Southern Pacific, pursuant to section 6 of the Railway Labor Act, 45 U.S.C. 156,[1] a notice of proposal to secure a change of agreement, as follows:
 
 
 5
 'Notice of our desire and intent for a rule to apply the provisions of the current Yard Agreement covering the class and craft of switchmen of the Southern Pacific (Pacific Lines) property * * * to all work in the nature of switching and allied service to be performed in the general area at a place and yard located on the Los Angeles Division named 'La Puente', or as presently being constructed and sometimes referred to as 'City of Industry, Future Yard Development."
 
 
 6
 Southern Pacific joined BRT[2] as a party to the present proceedings and counterclaimed for a declaration that SUNA's proposed change in agreement was not bargainable under section 6. The complaint of SUNA asking that the transfer of work be enjoined was dismissed. Upon the railroad's counterclaim the District Court rendered summary judgment in favor of SUNA, and it is from that judgment that Southern Pacific and BRT have appealed.
 
 
 7
 Southern Pacific and BRT both contend that the changes sought by SUNA's notice would constitute a raid on the established jurisdiction of BRT and do not give rise to a bargainable dispute under section 6.
 
 
 8
 SUNA argues that action of Southern Pacific in taking work from SUNA members and giving it to others, or in giving to others a disproportionate share of new work, clearly affects the working conditions of SUNA members; that a change in agreement dealing with Southern Pacific's ability to proceed in this fashion thus falls within section 6.
 
 
 9
 These objectives may well be the proper subject of a section 6 notice. SUNA, however, has not couched its notice in terms of these objectives. SUNA's notice does not attempt to obtain work for the craft of switchmen but rather attempts to take certain 'road work' away from the craft of trainmen. Since the craft lines have been drawn here in a peculiar fashion-- not on the basis of the nature of the work performed but rather on the basis of where it is performed-- any attempt by SUNA to obtain work for its members outside the 'switching limits' is an attempt to extend its craft lines.[3]
 
 
 10
 Thus the proposed change does not relate to 'working conditions' within the craft which SUNA represents. It is not directed to the retaining of work or even the securing of additional work by that craft. Instead, it is directed to a change in craft lines-- an expanding of the switchmen's craft to encompass the work now assigned to the craft of the trainmen. It bears directly on the 'working conditions' in another craft (that is, who is to perform certain work of that craft), as to which craft SUNA is not authorized to bargain.
 
 
 11
 Further it would require the railroad to recognize SUNA as bargaining representative in an area now within the representational jurisdiction of BRT, and in so doing clearly invades the area of jurisdictional disputes covered by section 2, Ninth, of the Act, 45 U.S.C. 152, Ninth.[4]
 
 
 12
 SUNA's proposed change thus reaches beyond the area in which the railroad is free to exercise its business judgment, and with respect to which it is a proper adversary of the union. It encompasses a delineation of the line between competing crafts-- the line which serves to separate the representational authority of competing unions-- and thus reaches into an area over which the railroad has no power of judgment and in which another union, and not the railroad, is the true adversary. These then are not such disputes as can be resolved by capitulation of the railroad and thus are not the proper subject of a section 6 notice.
 
 
 13
 SUNA apparently feels the need to extricate itself from what it now regards as an outmoded, unreasonable and discriminatory craft classification. It pictures itself as involved in a fight against ultimate craft extinction, based not upon the fact that technical advances have eliminated the need for the work it performs but rather upon the fact that existing craft lines are no longer appropriate. If so, it would seem that the resolution of its problems falls within the adjudicatory jurisdiction of the Mediation Board under section 2, Ninth. That section, in providing for the certification of bargaining representatives, would seem necessarily to encompass the essential preliminary steps of fixing craft lines and of resolving any inter-union disputes in that respect.
 
 
 14
 This is strongly suggested by language in General Committee of Adjustment, etc., v. M.-K.-T. R. Company, 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943). There the Court's holding was simply that such inter-union disputes as are presented by SUNA's notice are not to be resolved by the courts, but under the administrative procedures established by the Railway Labor Act. Describing the controversy before it, the Court stated (at page 334, 64 S.Ct. at page 151):
 
 
 15
 'It involves a jurisdictional dispute-- an asserted overlapping of the interests of two crafts. It necessitates a determination of the point where the authority of one craft ends and the other begins or of the zones where they have joint authority.'
 
 
 16
 Suggesting where, within the Act, resolution of such a controversy might be found, the Court states (at page 336, 64 S.Ct. at page 152):
 
 
 17
 'It seems to us plain that when Congress came to the question of these jurisdictional disputes, it chose not to leave their solution to the courts. As we have already pointed out, Congress left the present problems far back in the penumbra of those few principles which it codified. Moreover, it selected different machinery for their solution. Congress did not leave the problem of inter-union disputes untouched. It is clear from the legislative history of 2, Ninth, that it was designed not only to help free the unions from the influence, coercion and control of the carriers but also to resolve a wide range of jurisdictional disputes between unions or between groups of employees. H.Rep.No.1944, supra, p. 2; S.Rep.No.1065, 73d Cong., 2d Sess., p. 3. However wide may be the range of jurisdictional disputes embraced within 2, Ninth, Congress did not select the courts to resolve them. To the contrary, it fashioned an administrative remedy and left that group of disputes to the National Mediation Board.'
 
 
 18
 We conclude that the proposed change in agreement, which was the subject of SUNA's notice, does not fall within section 6; that Southern Pacific need not bargain thereon, and is accordingly entitled to judgment as prayed.
 
 
 19
 Reversed.
 
 On Rehearing
 
 20
 Before BARNES, MERRILL and BROWNING, Circuit Judges.
 
 MERRILL, Circuit Judge:
 
 21
 We granted rehearing in this case on petition of appellee, with Judge Barnes replacing the late Judge Orr.
 
 
 22
 Appellee urges that we are in error in concluding that craft lines between roadwork and yardwork are drawn geographically. It argues that historically and traditionally craft lines have been functionally drawn; that it has long been recognized that the work of road crews is to keep the trains running, while that of yard crews is to assemble and break up the trains; that the difference in operating conditions in yards and on the open road have called for different operating rules and different hours of work and salary scales; that these, rather than geography, are the relevant considerations in determining craft lines.
 
 
 23
 We adhere to our view, however. We are satisfied that while craft lines may originally have been drawn on functional bases, this ceased when rival unions became certified bargaining representatives of the two crafts. At that time, in order to fix precisely the limits of representational jurisdiction, more definite craft lines were drawn and the geographical basis was established to meet the requirement of precision. On our judgment the relevance of functional considerations is now confined to a determination of whether present craft lines, geographically drawn, should not be redrawn to bring within the craft of yardwork certain geographical areas not now included. Such determinations, for the reasons discussed in our original opinion, fall within the province of the Mediation Board.[5]
 
 
 24
 We conclude that appellee's remedy is to secure a new representational election by those employed in the craft of yardwork, including those employed at the City of Industry. Whether City of Industry employees may be so included is for the Mediation Board and not the railroad to decide.
 
 
 25
 We adhere to our original opinion.
 
 
 
 [1]
 Section 156 provides in pertinent part as follows:
 'Procedure in changing rates of pay, rules and working conditions
 Carriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions * * *.'
 
 
 [2]
 Other unions whose interests are aligned with BRT were also joined. We use 'BRT' as a reference to all such unions
 
 
 [3]
 The issues which were declared bargainable in Order of R.R. Telegraphers v. Chicago & No. W. Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1959), Rolfes v. Dwellingham, 198 F.2d 591 (8th Cir. 1952), Railroad Yardmasters of America v. St. Louis, S.F. Ry., 218 F.Supp. 193 (N.D.Texas 1963) did not involve a change in craft lines; rather they involved shifiting work from one craft to another
 
 
 [4]
 'Disputes as to identity of representatives; designation by Mediation Board: secret elections
 Ninth. If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier. Upon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter. In such an investigation, the Mediation Board shall be authorized to take a secret ballot of the employees involved, or to utilize any other appropriate method of ascertaining the names of their duly designated and authorized representatives in such manner as shall insure the choice of representatives by the employees without interference, influence, or coercion exercised by the carrier. In the conduct of any election for the purposes herein indicated the Board shall designate who may participate in the election and establish the rules to govern the election, or may appoint a committee of three neutral persons who after hearing shall within ten days designate the employees who may participate in the election. The Board shall have access to and have power to make copies of the books and records of the carriers to obtain and utilize such information as may be deemed necessary by it to carry out the purposes and provisions of this paragraph.'
 
 
 [5]
 Appellee asserts that the Mediation Board has indicated in various ways a present view that craft lines remain drawn on functional rather than geographical bases. We do not find the Board to have spoken directly to this point. Should it, in an appropriate proceeding, rule that such is the case we would of course recognize that its ruling is authoritative in the delineation of craft lines. However, in any event it appears that the City of Industry was not inincluded in the last representational election of the railroad's employees for the craft of yardwork and this would appear to be the last authoritative determination of craft lines. Thus, it would still appear to be within the province of the Mediation Board and not the railroad or the courts to resolve any dispute as to the craft in which workmen at City of Industry are employed