United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 9, 1999 Decided December 28, 1999 

 No. 98-7196

 Air Line Pilots Association, International, 
 Appellee/Cross-Appellant

 v.

 Northwest Airlines, Inc., 
 Appellant/Cross-Appellee

 Consolidated with 
 98-7202

 Appeals from the United States District Court 
 for the District of Columbia 
 (No. 97cv01917)

 John J. Gallagher argued the cause for appellant/cross-
appellee. With him on the briefs were Cathy Wassberg, Neal 
D. Mollen, and Intra L. Germanis.

 Jerry Anker argued the cause for appellee/cross-appellant. 
With him on the briefs were Elizabeth Ginsburg and James 
K. Lobsenz.

 Before: Ginsburg, Sentelle, and Garland, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: For more than 30 years North-
west Airlines has required newly hired pilot trainees to sign 
individual employment contracts called "Conditions of Em-
ployment." In 1995 Northwest added several new provisions 
to the Conditions, including a clause under which each trainee 
agreed to binding arbitration of any claim he might have 
against Northwest for discrimination in employment.

 The Air Line Pilots Association (ALPA), which is the union 
that represents Northwest pilots once they have completed 
their training, filed suit claiming that the carrier violated the 
Railway Labor Act, 45 U.S.C. s 151 et seq., by requiring 
individual trainees to agree to the Conditions without first 
having bargained with ALPA over them. The district court 
granted partial summary judgment for each party; the court 
enjoined Northwest, pending completion of the bargaining 
and mediation process, from applying the Arbitration Clause 
to pilots who have completed their training and are repre-
sented by ALPA, but refused to enjoin the use of any other of 
the Conditions.

 Northwest appeals, claiming that under Alexander v. 
Gardner-Denver Co., 415 U.S. 36 (1974), the arbitration of 
individual statutory claims is not a mandatory subject of 
collective bargaining and that Northwest is therefore free to 
bargain individually with its employees over the Arbitration 
Clause. We agree and accordingly reverse the judgment of 
the district court on this issue.

 ALPA cross-appeals, claiming the district court should have 
enjoined the use of other provisions that Northwest added to 
the Conditions in 1995. Because, in light of subsequent 
events, the cross-appeal does not present a live controversy, 
we dismiss ALPA's claim without prejudice to its raising the 
same claim in the future.

 I. Background

 The relationship between Northwest and ALPA is gov-
erned by the Railway Labor Act (RLA), 45 U.S.C. s 151 et 
seq. Under RLA s 2 First, 45 U.S.C. s 152 First, the carrier 
is required to "exert every reasonable effort to make and 
maintain agreements concerning rates of pay, rules, and 
working conditions." This statutory obligation to bargain 
with the union in good faith is backed up by RLA s 2 
Seventh, 45 U.S.C. s 152 Seventh, which provides that "[n]o 
carrier ... shall change the rates of pay, rules, or working 
conditions of its employees, as a class as embodied in agree-
ments except in the manner prescribed in such agreements or 
in [s 6 of the RLA]." In other words, if the carrier is unable 
to reach agreement with the union on changing a rate of pay, 
rule, or working condition, then it must maintain the status 
quo until it has satisfied the multi-step process of negotiation, 
mediation, arbitration, and cooling-off required under RLA 
s 6, 45 U.S.C. s 156. See Detroit & Toledo Shore Line R.R. 
Co. v. United Transportation Union, 396 U.S. 142, 149 (1969) 
(describing negotiation process under s 6 as "almost intermi-
nable"). If at the end of that process the parties have not 
reached an agreement, then the employer may unilaterally 
implement its proposal and the union may resort to economic 
self-help to resist the change.

 Matters that are "directly related to 'rates of pay, rules, 
and working conditions'," and may therefore trigger the 
obligations of RLA s 2 First and Seventh, are denominated 
"mandatory subject[s] of collective bargaining," a phrase 
courts have borrowed from case law arising under the Nation-
al Labor Relations Act. Japan Air Lines Co. v. Internation-
al Ass'n of Machinists, 538 F.2d 46, 52 (2d Cir. 1976). If a 
carrier and a union have a dispute over a proposed change to 
a mandatory subject of bargaining, then the union can get an 
injunction prohibiting the carrier from unilaterally imple-
menting the change before completing the lengthy negotiation 
process set out in s 6. On the other hand, if the dispute is 
over a non-mandatory subject, then the carrier may unilater-
ally implement the change unless limited by an existing 
collective bargaining agreement (CBA).

 A. Northwest's Practice, 1966-97
 
 ALPA has represented the pilots of Northwest Airlines in 
collective bargaining for nearly 60 years. When a pilot first 
begins his training with Northwest, he is not represented by 
ALPA or by any other union. When the pilot completes his 
training and enters into "revenue service" as a probationary 
employee, however, he immediately becomes a member of the 
bargaining unit represented by ALPA.

 As early as 1966 Northwest unilaterally began to require 
that each trainee pilot agree to the Conditions as part of his 
contract of employment. The earliest known Conditions in-
cluded provisions covering such matters as the trainee's pay, 
permission to use his likeness in promotions, and the assign-
ment of rights to anything he might invent. Although train-
ees are not represented by ALPA when they agree to the 
Conditions, some of the Conditions either expressly or implic-
itly continue to apply for as long as the signatory remains 
employed as a pilot with Northwest, that is, even after the 
pilot becomes a member of the bargaining unit represented 
by ALPA.

 Over the course of three decades Northwest made numer-
ous changes to the Conditions without consulting ALPA. In 
1995 the airline added an Arbitration Clause requiring em-
ployees to submit to binding arbitration all claims against it 
arising from the employment relationship. Of particular 
relevance to this appeal, the Arbitration Clause specifically 
requires binding arbitration of statutory employment discrim-
ination claims brought under "the Minnesota Human Rights 
Acts, Title VII of the Civil Rights Act, the Age Discrimination 
in Employment Act, the Americans with Disabilities Act, or 
any other state or federal law prohibiting employment dis-
crimination" (citations omitted). Also in 1995, Northwest 
unilaterally introduced other new Conditions: (1) setting the 
pilot's monthly salary during the probationary period, when 
he has completed his training and is represented by ALPA; 
(2) requiring the pilot to submit to a medical examination if 
Northwest has reason to believe he is no longer able to 
perform his essential job functions; (3) acknowledging that 

Northwest may change various working conditions at its 
option; and (4) acknowledging that failure to comply with 
company rules is a ground for termination.

 B. ALPA's Objection, 1997-Present
 
 In 1997 Northwest notified ALPA that it was terminating a 
probationary pilot and attached to the notice a copy of the 
Conditions he had signed. ALPA, which claims that this was 
the first it had learned of the Conditions, demanded that 
Northwest cease requiring trainee pilots to agree to them and 
that it inform each pilot who had signed Conditions that they 
were null and void. When Northwest refused to do so, ALPA 
filed suit in district court seeking injunctive and declaratory 
relief on the ground that Northwest had violated the RLA by 
unilaterally implementing the Conditions, which ALPA al-
leged are individual contracts concerning mandatory subjects 
of bargaining, without first negotiating with the Union as 
required by the RLA.

 While the suit was pending before the district court, North-
west, in an attempt to respond to some of ALPA's concerns 
regarding the 1995 Conditions, deleted three and revised one 
of the provisions to which the Union objected. In presenting 
the new version (the 1997 Conditions) to ALPA, Robert 
Brodin, Northwest's vice president for labor relations, wrote:

 Northwest has never interpreted or applied the Condi-
 tions of Employment to operate in derogation of the 
 collective bargaining agreement between Northwest and 
 ALPA. Northwest and ALPA both agree that in the 
 event of overlap or inconsistency, the collective bargain-
 ing agreement controls.
 
As to the Arbitration Clause in particular, however, Brodin 
wrote that "Northwest continues to believe that it has the 
right to insist on arbitration of non-contract claims as a 
condition of employment for new hires." The only significant 
change Northwest made to the Arbitration Clause was to 
clarify that it does not apply to claims arising out of the CBA 
between Northwest and ALPA.

 Both ALPA and Northwest moved for summary judgment 
on the validity of the Conditions. The district court first 
considered whether Northwest's use of Conditions originating 
before 1995 violated the RLA. The court held that ALPA, by 
its failure to object to the Conditions for some 30 years, had 
arguably consented to them, which if true would make use of 
the Conditions an implied term of the CBA between North-
west and ALPA. Because that dispute related solely to the 
meaning of the CBA, the court held it could be resolved only 
by binding arbitration pursuant to RLA ss 2 Sixth and 3 
First, 45 U.S.C. ss 152 Sixth and 153 First.

 The court concluded that ALPA had objected in a timely 
fashion, however, to the Arbitration Clause introduced in 
1995, and therefore had not acquiesced in Northwest's use of 
that term. The district court then held that the Arbitration 
Clause deals with a mandatory subject of bargaining. Be-
cause the Arbitration Clause would have worked a change 
with respect to a mandatory subject and ALPA had neither 
agreed to nor acquiesced in that change, the court enjoined 
Northwest from applying the Arbitration Clause to any pilot 
represented by ALPA.

 The district court did not address the question whether 
other clauses ALPA claimed were newly included in the 1995 
Conditions also violated the RLA. ALPA therefore moved to 
amend the court's order so as to enjoin Northwest from 
implementing those clauses but the district court denied the 
motion because of ALPA's failure to comply with local court 
rules.

 II. Analysis

 ALPA does not challenge the district court's determination 
that Northwest's use of Conditions originating before 1995 
must be resolved through binding arbitration. Therefore, 
both Northwest's appeal and ALPA's cross-appeal concern 
only the Union's request for an injunction against North-
west's use of particular provisions that ALPA maintains first 
appeared in the 1995 Conditions.

 A. Northwest's Appeal: The Arbitration Clause
 
 Is the arbitration of statutory discrimination claims a man-
datory subject of bargaining? Northwest says not and claims 
the district court erred in enjoining its use of the Arbitration 
Clause, reasoning as follows. Under Alexander v. Gardner-
Denver Co., 415 U.S. 36 (1974), a union cannot waive the right 
of the employees it represents to bring a statutory discrimi-
nation claim in a judicial forum. Because ALPA cannot agree 
to such a provision, it cannot be a mandatory subject of 
bargaining. Therefore, Northwest is free to deal directly 
with its employees over the arbitration of such claims.

 For its part, ALPA urges that the arbitration of statutory 
claims is a mandatory subject, and that we should therefore 
affirm the district court's judgment, for three independent 
but related reasons. First, Gilmer v. Interstate/Johnson 
Lane Corp., 500 U.S. 20 (1991) "effectively supersedes" 
Gardner-Denver. If, as ALPA reads Gilmer, a union may in 
collective bargaining waive the employees' right to a judicial 
forum for a statutory discrimination claim, then there is no 
reason to doubt that the arbitration of statutory claims is a 
mandatory subject of bargaining. Second, even if Gardner-
Denver is still good law, it has no effect upon whether 
arbitration of statutory claims is a mandatory subject of 
bargaining. In other words, as the district court held, North-
west must bargain with ALPA over the Arbitration Clause 
regardless whether ALPA could lawfully agree to it because 
it is directly related to "rates of pay, rules, or working 
conditions." Third, even if waiver of the right to a judicial 
forum is not a mandatory subject of bargaining because 
ALPA cannot agree to such a waiver under Gardner-Denver, 
the procedural rules for arbitration, as specified in the Arbi-
tration Clause, are mandatory subjects of bargaining.

 In Gardner-Denver, the Supreme Court considered wheth-
er an employee who had pursued arbitration of a racial 
discrimination claim under a CBA was thereby precluded 
from later asserting a Title VII claim based upon the same 
facts. 415 U.S. at 46-55. The Supreme Court held that 
"there can be no prospective waiver of an employee's rights 

under Title VII." Id. at 51. Because Title VII provides each 
individual with the right to be free of invidious discrimination, 
"the rights conferred can form no part of the collective-
bargaining process since waiver of these rights would defeat 
the paramount congressional purpose behind Title VII." Id. 
Therefore, although the union could and did prospectively 
waive the employee's right to sue upon (rather than arbitrate) 
his claim of discrimination in violation of the CBA, the 
employee's resort to arbitration of this claim did not preclude 
him from suing upon his statutory claim of discrimination. 
See id. at 51-52.

 The Supreme Court also rejected the suggestion that a 
court should dismiss a Title VII claim if the facts underlying 
it had already been the subject of arbitration under a CBA 
that prohibited, and provided a remedy for, the discrimina-
tion. According to the Court, arbitral processes were inferior 
to judicial processes for protecting statutory rights, and the 
Congress intended the federal courts to exercise final respon-
sibility over Title VII claims. See id. at 56-59. The Court 
was particularly concerned that a union, which ordinarily 
controls the arbitration of an employee's claim, might, if 
allowed, compromise the would-be Title VII plaintiff's statuto-
ry rights: "In arbitration, as in the collective-bargaining 
process, the interests of the individual employee may be 
subordinated to the collective interests of all employees in the 
bargaining unit." Id. at 58 n.19.

 In the early 1980s the Supreme Court twice applied the 
reasoning of Gardner-Denver beyond the context of Title 
VII. In Barrentine v. Arkansas-Best Freight System, Inc., 
450 U.S. 728 (1981), employees had filed suit under the Fair 
Labor Standards Act after having lost in arbitration on a 
contractual claim arising from the same facts. The employer 
argued that the employees' union had waived their right to 
bring the FLSA claim in court, noting that the CBA required 
employees to arbitrate "any controversy" and that the em-
ployees had in fact pursued this matter to arbitration. Id. at 
736. The Court rejected this argument:

 [T]he FLSA rights petitioners seek to assert in this 
 action are independent of the collective bargaining pro-
 cess. They devolve on petitioners as individual workers, 
 not as members of a collective organization. They are 
 not waivable. Because Congress intended to give indi-
 vidual employees the right to bring their minimum-wage 
 claims under the FLSA in court, and because these 
 congressionally granted FLSA rights are best protected 
 in a judicial rather than in an arbitral forum, we hold 
 that petitioners' claim is not barred by the prior submis-
 sion of their grievances to the contractual dispute-
 resolution procedures.
 
Id. at 745. In McDonald v. City of West Branch, 466 U.S. 
284 (1984), the Supreme Court rejected the employer's argu-
ment that an employee's s 1983 claim should be dismissed 
because he had already pursued to arbitration under the CBA 
a claim based upon the same facts. The Court premised its 
holding upon two factors: the inadequacy of arbitration for 
the enforcement of individual statutory rights, and the inten-
tion of the Congress that s 1983 be judicially enforced. See 
id. at 289-90.

 In light of the Court's broad pronouncement in Gardner-
Denver that "there can be no prospective waiver of an 
employee's rights under Title VII," and the application of this 
principle to other federal statutes in Barrentine and Mc-
Donald, many courts concluded that the reasoning of 
Gardner-Denver applied to still other federal employment 
statutes, see Brisentine v. Stone & Webster Engineering 
Corp., 117 F.3d 519, 526 (11th Cir. 1997) (Americans with 
Disabilities Act); Cooper v. Asplundh Tree Expert Co., 836 
F.2d 1544, 1553 (10th Cir. 1988) (Age Discrimination in 
Employment Act (ADEA)), and held that Gardner-Denver 
precluded prospective waiver of the right to sue even by the 
individual employee, see Alford v. Dean Witter Reynolds, 
Inc., 905 F.2d 104, 107 (5th Cir. 1990) (Title VII), vacated for 
reconsideration, 500 U.S. 930 (1991), in light of Gilmer; 
Utley v. Goldman Sachs & Co., 883 F.2d 184, 187 (1st Cir. 
1989) (Title VII); Nicholson v. CPC Int'l Inc., 877 F.2d 221, 
229 (3d Cir. 1989) (ADEA), disapproved in Gilmer, 500 U.S. 

20, 24 n.1 (1991); Swenson v. Management Recruiters Int'l, 
Inc., 858 F.2d 1304, 1306 (8th Cir. 1988) (Title VII).

 In 1991, however, the Court staked out a limit to the 
principle announced in Gardner-Denver. In Gilmer v. Inter-
state/Johnson Lane Corp., 500 U.S. 20 (1991), the Court held 
that a claim arising under the ADEA was validly made 
subject to binding arbitration by an agreement between the 
employer and the individual (non-union) employee--a result 
in some tension with the broad pronouncement in Gardner-
Denver that "there can be no prospective waiver of an 
employee's rights under Title VII." 415 U.S. at 51. The 
Court began by noting that under the Federal Arbitration 
Act (FAA) an agreement to arbitrate individual statutory 
rights is enforceable unless the Congress intended to pre-
clude waiver of access to a judicial forum for vindication of 
that right. See id. at 26. The text and legislative history of 
the ADEA reflect no such intent, and the Court rejected the 
argument that waiver should be precluded because arbitra-
tion is an inferior mechanism for resolving individual statuto-
ry claims--an argument to which the Court had given some 
weight in Gardner-Denver, Barrentine, and McDonald, see 
id. at 34 n.5. The Court expressly distinguished those cases 
as follows:

 First, [they] did not involve the issue of the enforceabili-
 ty of an agreement to arbitrate statutory claims. Rath-
 er, they involved the quite different issue whether arbi-
 tration of contract-based claims precluded subsequent 
 judicial resolution of statutory claims. Since the employ-
 ees there had not agreed to arbitrate their statutory 
 claims, and the labor arbitrators were not authorized to 
 resolve such claims, the arbitration in those cases under-
 standably was held not to preclude subsequent statutory 
 actions. Second, because the arbitration in those cases 
 occurred in the context of a collective-bargaining agree-
 ment, the claimants there were represented by their 
 unions in the arbitration proceedings. An important 
 concern therefore was the tension between collective 
 representation and individual statutory rights, a concern 
 not applicable to the present case. Finally, those cases 
 were not decided under the FAA.... Therefore, those 
 
 cases provide no basis for refusing to enforce Gilmer's 
 agreement to arbitrate his ADEA claim.
 
Id. at 35.

 Thus, Gilmer establishes that an individual employee may 
himself validly agree in advance to binding arbitration of a 
statutory claim he may later have against his employer. See 
Cole v. Burns Int'l Security Servs., 105 F.3d 1465, 1478 (D.C. 
Cir. 1997) (citing Gilmer for the "general rule [that] statutory 
claims are fully subject to binding arbitration, at least outside 
of the context of collective bargaining"). The Court in Gil-
mer did not, however, address the continuing vitality of the 
statement in Gardner-Denver that "the rights conferred [by 
Title VII] can form no part of the collective bargaining 
process." 415 U.S. at 51; see also Wright v. Universal 
Maritime Serv. Corp., 525 U.S. 70, 119 S. Ct. 391, 396 (1998) 
(raising but not resolving the question "whether or not Gard-
ner-Denver's seemingly absolute prohibition of union waiver 
of employees' federal forum rights survives Gilmer").

 ALPA suggests that Gilmer "effectively supersedes" 
Gardner-Denver and permits a union to waive the employees' 
right to a judicial forum for statutory claims. The Fourth 
Circuit and some district courts agree, see Austin v. Owens-
Brockway Glass Container, Inc., 78 F.3d 875, 885 (4th Cir. 
1996); see, e.g., Almonte v. Coca-Cola Bottling Co., 959 
F. Supp. 569, 573-74 (D. Conn. 1997), prematurely we think.

 Whatever the Supreme Court said--or, more precisely, 
refrained from saying--in Wright, we do not understand the 
Court in Gilmer to have overruled Gardner-Denver. Rather, 
the Court expressly distinguished that case, which strongly 
implies that it remains the law within its field of application. 
We therefore leave to the Court itself the prerogative of 
overruling its own precedent (if it will); we apply the law as it 
stands. See Rodriguez de Quijas v. Shearson/American Ex-
press Inc., 490 U.S. 477, 484 (1989).

 We see a clear rule of law emerging from Gardner-Denver 
and Gilmer: Unless the Congress has precluded his doing so, 
an individual may prospectively waive his own statutory right 
to a judicial forum, but his union may not prospectively waive 
that right for him. All of the circuits to have considered the 

meaning of Gardner-Denver after Gilmer, other than the 
Fourth, are in accord with this view. See Albertson's, Inc. v. 
United Food & Com. Workers Union, 157 F.3d 758, 761-62 
(9th Cir. 1998); Penny v. United Parcel Service, 128 F.3d 
408, 413-14 (6th Cir. 1997); Brisentine v. Stone & Webster 
Engineering Corp., 117 F.3d 519, 526 (11th Cir. 1997); Pryn-
er v. Tractor Supply Co., 109 F.3d 354, 365 (7th Cir. 1997); cf. 
Harrison v. Eddy Potash, Inc., 112 F.3d 1437, 1453 (10th Cir. 
1997) (individual represented by union need not exhaust 
remedies under CBA before filing statutory claim in court); 
Varner v. National Super Market, Inc., 94 F.3d 1209, 1213 
(8th Cir. 1996) (same); Tran v. Tran, 54 F.3d 115, 117-18 (2d 
Cir. 1995) (same); see also Cole v. Burns Int'l Security 
Servs., 105 F.3d 1465, 1478-79 (D.C. Cir. 1997) ("It is plain 
that the Supreme Court saw a critical distinction in the 
situations raised by Gardner-Denver and Gilmer: Gardner-
Denver involved arbitration in the context of collective bar-
gaining .... Gilmer, on the other hand, raised an individual 
employee claim outside the collective bargaining context").

 Thus, even after Gilmer, Gardner-Denver stands as a 
firewall between individual statutory rights the Congress 
intended can be bargained away by the union, see, e.g., 
Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 706-07 & 
n.11 (1983) (union may waive officers' statutory right to be 
free of discrimination, such as enhanced discipline, based 
upon union activity), and those that remain exclusively within 
the individual's control. Absent congressional intent to the 
contrary, a union may not use the employees' individual 
statutory right to a judicial forum as a bargaining chip to be 
exchanged for some benefit to the group; the statutory right 
"can form no part of the collective bargaining process." 
Gardner-Denver, 415 U.S. at 51. Applying this rule to the 
facts of the present case, ALPA could not lawfully agree to 
the Arbitration Clause because it would effect a waiver of the 
employees' right to a judicial forum for the vindication of 
their statutory claims of discrimination in employment.

 ALPA argues, however, that even if Gardner-Denver pre-
cludes it from waiving employees' right of access to a judicial 
forum for a statutory claim, the arbitration of an 
employment-related claim--whatever the legal basis for the 
claim--remains a mandatory subject of bargaining. The 

district court agreed, holding that the Arbitration Clause is a 
mandatory subject of bargaining "regardless of whether 
[ALPA] can itself enter into arbitration agreements on behalf 
of its members" because the Clause "governs rules or condi-
tions of the pilots' employment with Northwest." In effect, 
the district court held that an employer has to bargain over a 
proposal concerning rates of pay, rules, or working conditions 
that the union is not authorized to accept and the employer 
could not enforce.

 We cannot agree. The "essence of collective bargaining is 
a notion of mutuality, that if a subject is brought up each side 
has at least the authority both to offer and to concede." 
Brotherhood of Railroad Trainmen v. Akron & Barberton 
Belt R.R. Co., 385 F.2d 581, 603 (D.C. Cir. 1967). It follows 
that a proposal to trade that which is not one's to give cannot 
be a mandatory subject of bargaining. See Brotherhood of 
R.R. Trainmen, 385 F.2d at 603-04 (proposal to bargain over 
effects of job terminations, normally a mandatory subject, 
held non-mandatory because union "could not bargain away 
any part of the rights that accrued to employees under the 
[arbitral] Award"); Southern Pacific Co. v. Switchmen's Un-
ion, 356 F.2d 332, 334-35 (9th Cir. 1966) (proposal to redefine 
certain work as within particular craft held non-mandatory 
because railroad could not lawfully agree to it: "These then 
are not such disputes as can be resolved by capitulation of the 
railroad and thus are not the proper subject [for bargaining 
under RLA] section 6"). Because Gardner-Denver precludes 
ALPA from agreeing to binding arbitration of individual 
statutory claims, we conclude that the Arbitration Clause is 
not a mandatory subject of bargaining.*

 ALPA argues next that the district court properly enjoined 
Northwest's implementation of the Arbitration Clause even if 
the waiver of employees' right to a judicial forum for statuto-

__________
 * Although Gardner-Denver suggests that the arbitration of indi-
vidual statutory claims is an impermissible subject of bargaining, 
we need not decide today whether it is an impermissible or a 
permissible subject; the only issue presented is whether it is a 
mandatory subject. See Brotherhood of Railroad Trainmen, 385 
F.2d at 604 n.52.

ry claims is not a mandatory subject, because ALPA can still 
lawfully bargain over the procedures to be used in arbitration. 
The Union claims these procedures are a mandatory subject 
of bargaining because the remedy awarded to a successful 
complainant in the arbitration of a discrimination claim could 
affect the "rates of pay, rules, or working conditions" of all 
employees, for example by restructuring their seniority 
rights.

 We fail to see how a remedy imposed by an arbitrator in a 
proceeding involving only the employer and an individual 
employee could have any adverse effect upon the working 
conditions of the employees in the bargaining unit. Although 
an arbitral award could indeed subject the employer to an 
obligation inconsistent with the CBA, that is not the Union's 
problem but the employer's: the employer simply cannot 
make any unilateral change respecting a mandatory subject 
of bargaining without first negotiating with the Union as 
required under the RLA, and a private arbitration between 
the employer and an individual employee does not alter this 
rule of law.

 In any event, as we read Gardner-Denver and Gilmer, 
ALPA can have no role in negotiating obligatory procedural 
rules for arbitration of individual statutory claims. Read 
together, those cases establish that only the individual can 
determine in what forum he will vindicate his statutory rights, 
and this choice should not be burdened by the majoritarian 
concerns that motivate a union. If a union has a mandatory 
role in negotiating the terms that will apply to arbitration, 
then it could also contrive to discourage the exercise of the 
employee's right to choose a forum.

 We conclude that the Arbitration Clause is not a mandatory 
subject of bargaining under the RLA. Therefore, Northwest 
is not required by RLA s 2, 45 U.S.C. 152, to negotiate with 
ALPA over it. Instead, Northwest may, as it did, propose 
the Arbitration Clause directly to each individual employee. 
While it has long been clear that "members [of a bargaining 
unit] cannot bargain individually on behalf of themselves as to 
matters which are properly the subject of collective bargain-
ing," Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192 

(1944), it is just as well-established that an employee repre-
sented by a union may bargain directly with his employer 
over a non-mandatory subject of collective bargaining as long 
as the proposed individual contract "is not inconsistent with a 
collective agreement" or somehow implicated in an unfair 
labor practice, J.I. Case Co. v. NLRB, 321 U.S. 332, 339 
(1944).

 Here, the Arbitration Clause applies only to the statutory 
rights of individuals and is not inconsistent with the CBA; 
nor is Northwest using its direct dealings with the employees 
either to change anyone's obligations under the CBA or to 
avoid dealing with the union on a mandatory subject of 
bargaining. Under these circumstances, the RLA is no bar 
to Northwest's contracting individually with its employees.

 B. ALPA's Cross-Appeal: Other Clauses New in 1995
 
 ALPA claims the district court erred in failing to enjoin 
Northwest from unilaterally implementing provisions other 
than the Arbitration Clause that the carrier added to the 1995 
Conditions and that concern mandatory subjects of bargain-
ing. Northwest counters that ALPA's cross-appeal does not 
present a ripe controversy in light of the airline's adoption of 
the scaled-down 1997 Conditions and its subsequent represen-
tations concerning their application. For the reasons stated 
below, we agree with Northwest and dismiss ALPA's cross-
appeal for want of a ripe controversy.

 In 1997 Northwest dropped three of the clauses in the 1995 
Conditions about which ALPA now complains. ALPA asserts 
that its challenge to these three clauses remains ripe because 
"Northwest has done nothing ... to alter or revoke the 1995 
[Conditions] that have been signed by 1050 Northwest pilots, 
and that still remain in effect." At oral argument before this 
court, however, Northwest deliberately and unequivocally 
represented that the 1997 Conditions supersede any previous 
Conditions, and that the three clauses deleted in 1997 will not 
be enforced against persons who signed the 1995 (or prior) 
Conditions.

 Although we are aware that "voluntary cessation of alleged-
ly illegal conduct does not ... make the case moot," a claim 
for injunctive relief still requires "some cognizable danger of 

recurrent violation, something more than the mere possibility 
which serves to keep the case alive." United States v. W.T. 
Grant Co., 345 U.S. 629, 632-33 (1953); see also Community 
for Creative Non-Violence v. Hess, 745 F.2d 697, 700-01 
(D.C. Cir. 1984). ALPA's only response to this requirement 
is to say that at some time in the future Northwest might not 
honor its representation to the court. That is insufficient to 
render ALPA's requests for injunctive relief ripe at this time. 
If in the future Northwest were to enforce one of the clauses 
against a signatory employee, or were to indicate its "firm 
intention" to do so, Andrade v. Lauer, 729 F.2d 1475, 1481 
(D.C. Cir. 1984), then the Union would have a ripe claim for 
injunctive relief; at present, however, "the parties have no 
live dispute ... and whether one will arise in the future is 
conjectural," Anderson v. Green, 513 U.S. 557, 559 (1995).

 ALPA's only other concern is with the amended version of 
the Rules of Conduct clause in the 1997 Conditions. ALPA 
objected to the Rules of Conduct clause in the 1995 Condi-
tions because it stated that failure to comply with the compa-
ny's rules and regulations "shall be grounds for [ ] termi-
nation," but termination is governed by the CBA. In 1997, 
therefore, Northwest amended the Rules of Conduct provi-
sion to provide that Northwest's authority to discipline an 
employee represented by the Union is "subject to the griev-
ance and arbitration provisions of the applicable [CBA]." 
This revision, coupled with Northwest's firm representation 
that it will enforce the Rules of Conduct provision only to the 
extent allowed by the 1997 Conditions, would seem to render 
ALPA's claim for injunctive relief unripe.

 At oral argument, however, ALPA suggested that the 
revised Rules of Conduct clause still presents a ripe contro-
versy insofar as it provides that "the Company, in its sole 
discretion, may amend [its] rules, regulations, or policies from 
time to time." If Northwest ever "in its sole discretion" 
changed a rule, regulation, or policy concerning a mandatory 
subject of bargaining, then it would violate its obligation 
under the RLA to negotiate such changes with the Union. In 
response to concern over this part of the Rules of Conduct 
clause, Northwest represented to the court that, "as to man-

datory subjects of bargaining, [Northwest] cannot and will 
not make unilateral changes. Because the union has a legiti-
mate interest." By this representation Northwest acknowl-
edges that the phrase "in its sole discretion" is implicitly 
qualified by the laws of the United States, just as if the 
Condition said "provided, however, that Northwest may not 
make a change concerning a mandatory subject of bargaining 
without first negotiating with ALPA as required by the 
RLA."

 In light of Northwest's representation, we fail to discern 
any present controversy over the Rules of Conduct clause. 
The parties agree that the clause does not affect Northwest's 
obligations under the RLA to negotiate with ALPA. North-
west has not invoked the clause to make any unilateral 
change concerning a mandatory subject of bargaining, and it 
unequivocally states that it will not do so in the future. 
ALPA's claim reduces to the fear that sometime in the future 
Northwest may renege upon this representation to the court. 
That possibility is speculative at best, and in our view utterly 
implausible. But should it ever come to pass, then the doors 
of the courthouse will be open wide to ALPA.

 III. Conclusion

 Northwest did not violate the RLA by implementing the 
Arbitration Clause without first negotiating with ALPA. In 
No. 98-7196, therefore, we vacate the injunction the district 
court entered against Northwest. In No. 98-7202, ALPA's 
cross-appeal, we do not find a ripe case or controversy at this 
time; accordingly, we dismiss that case without prejudice to 
ALPA's raising the same claim in the future.

 It is so ordered.